WEINZWEIG, Judge:
¶1 The Supremacy Clause of the United States Constitution bars a state common-law tort claim under the doctrine of implied preemption when it presents an obstacle to the purposes and objectives of a federal law or regulation. A federal agency may trigger implied obstacle preemption when it refuses to set formal equipment standards to advance a regulatory purpose or objective. At issue here is the National Highway Traffic Safety Administration's ("NHTSA") refusal to set formal standards for advanced automatic braking technologies in light vehicles, and whether that refusal preempts Arizona common-law tort claims against Nissan for manufacturing the 2008 Nissan Rogue without these safety features. The superior court dismissed the lawsuit as preempted. We affirm.
FACTS AND PROCEDURAL BACKGROUND
¶2 This products liability case stems from an April 2015 car collision. Antea Dashi was driving her Honda Accord on a one-way street when she missed her intended exit. Rather than traverse side-streets to reach her destination, Dashi decided to turn around and return to the exit against oncoming traffic. A second vehicle stopped in the street behind Dashi as she performed an illegal U-turn, and a third vehicle followed behind the second vehicle, creating a backup. Unaware of Dashi's unfolding turn, the third vehicle, a 2008 Nissan Rogue, swerved around the second vehicle and crashed into Dashi's then-perpendicular *15 vehicle. Dashi suffered serious head injuries.
¶3 Dashi sued Nissan in the superior court, asserting state common-law tort claims. As relevant here, she alleged the collision would not have occurred if Nissan had equipped the 2008 Nissan Rogue with then-available automatic emergency braking ("AEB") systems, including Forward Collision Warning ("FCW") and Crash Imminent Braking ("CIB"). FCW "uses information from forward-looking sensors to determine whether or not a crash is likely or unavoidable" and warns the driver to "brake and/or steer to avoid a crash or minimize the force of the crash." Federal Motor Vehicle Safety Standards; Automatic Emergency Braking ("FMVSS AEB"), 82 Fed. Reg. 8391, 8392 (Jan. 25, 2017). CIB "uses information from forward-looking sensors to automatically apply the brakes in driving situations in which a crash is likely or unavoidable and the driver makes no attempt to avoid the crash."[1] Id. Dashi asserted that Nissan's failure to install this "safety technology rendered the 2008 Nissan Rogue unreasonably dangerous and defective."
¶4 Nissan moved for summary judgment under Arizona Rule of Civil Procedure 56, arguing that Dashi's claims are preempted under federal law. The superior court agreed and dismissed the lawsuit. The court found that NHTSA decided "[vehicle] manufacturers [should have] options with regard to which [automatic braking] safety features to adopt," which "preempts the state court tort action based on whether the lack of FCW and [CIB] technology renders the 2008 Nissan Rogue as defective." This timely appeal followed. We have jurisdiction pursuant to A.R.S. § 12-2101(A)(1).
DISCUSSION
¶5 We "review de novo issues of law relating to alleged federal preemption of state law claims." Conklin v. Medtronic, Inc. , 245 Ariz. 501, 504, ¶ 7, 431 P.3d 571 ,574 (2018). Nissan bears the burden of establishing the preemption defense. See id. at 504, ¶ 8, 431 P.3d at 574.
¶6 Dashi argues that federal law does not preempt her state common-law design-defect and negligence claims because her lawsuit would not interfere with the purposes or objectives of federal regulations. Nissan counters that Dashi's claims were properly dismissed under the doctrine of implied preemption because her requested relief-a jury-imposed requirement that light vehicles in Arizona, manufactured in 2008 or later, must be equipped with FCW and CIB systems-would erect an obstacle to federal policy objectives.[2]
A. Federal Preemption Law
¶7 Congressional intent is the touchstone of federal preemption under the Supremacy Clause. Cipollone v. Liggett Grp., Inc. , 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). There is a presumption against preemption, based on "the assumption that the historic police powers of the States were not to be superseded ... unless that was the clear and manifest purpose of Congress," particularly in "a field which the States have traditionally occupied." Wyeth v. Levine , 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009).
¶8 Preemption may be express or implied. Id. This case is about implied conflict preemption, which has two forms: (1) impossibility preemption and (2) obstacle preemption. Geier v. Am. Honda Motor Co. , 529 U.S. 861, 899, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). Relevant here is the second form, which preempts state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of a federal law or regulation. Williamson v. Mazda Motor of Am., Inc. , 562 U.S. 323, 330, 131 S.Ct. 1131, 179 L.Ed.2d 75 (2011) (quoting Hines v. Davidowitz , 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) ).
*16 ¶9 A federal agency may trigger implied obstacle preemption when it refuses to adopt a specific equipment standard in furtherance of a federal regulatory objective, thus deliberately leaving manufacturers with equipment alternatives. Geier , 529 U.S. at 881, 886, 120 S.Ct. 1913. At issue in Geier was the preemptive effect of Federal Motor Vehicle Safety Standard 208 ("FMVSS 208"), where the Department of Transportation ("DOT") rejected a requirement that all vehicle manufacturers install airbags as standard equipment, and instead left manufacturers the ability to choose from a diverse menu of passive restraint devices.[3] Id. at 874-75, 879, 120 S.Ct. 1913. A motorist sued Honda under state tort law for "negligently and defectively" designing her 1987 Honda Accord "because it lacked a driver's side airbag." Id. at 865, 120 S.Ct. 1913. Honda argued the claim was preempted because it conflicted with the federal objectives set forth in FMVSS 208. Id. at 894, 120 S.Ct. 1913.
¶10 The Court first discerned the federal purposes and objectives at issue based on "the regulation [and] its history," DOT's "explanation of its objectives," and its "current views of the regulation's pre-emptive effect." Williamson , 562 U.S. at 330, 131 S.Ct. 1131 (discussing Geier , 529 U.S. at 875-81, 120 S.Ct. 1913 ). The regulation and DOT's explanation of its objectives "made clear that manufacturer choice was an important means for achieving its basic objectives," id. at 331, 131 S.Ct. 1131, and that DOT "deliberately sought variety" in hopes that "a mix of several different passive restraint systems" would lead to the "development of alternative, cheaper, and safer passive restraint systems" and would "lower costs, overcome technical safety problems, encourage technological development, and win widespread consumer acceptance," Geier , 529 U.S. at 875, 878-79, 120 S.Ct. 1913. The Court also heard from DOT, which argued in favor of preemption, informing the Court that FMVSS 208 "embodies the [DOT] Secretary's policy judgment that safety would best be promoted if manufacturers installed alternative protection systems in their fleets rather than one particular system in every car." Id. at 881, 120 S.Ct. 1913.
¶11 In the end, the Court held that the state tort claims were preempted because they stood " 'as an obstacle to the accomplishment and execution of' the important means-related federal objectives" in FMVSS 208. Id. (quoting Hines , 312 U.S. at 67, 61 S.Ct. 399 ). The Court determined that FMVSS 208 reflected "significant considerations," including DOT's policy judgment that "safety would best be promoted if manufacturers" had a "variety and mix" of alternative restraint mechanisms, including airbags, seatbelts and interlock devices. Id. at 876-78, 881, 120 S.Ct. 1913. And the state tort claim at issue would have created "a rule of state tort law imposing" a duty on all car manufacturers "to install airbags rather than other passive restraint systems, such as automatic belts or passive interiors." Id. at 881, 120 S.Ct. 1913.
B. DOT And NHTSA
¶12 Nissan contends NHTSA's denial of rulemaking for AEB standards likewise preempts Dashi's tort claim here. Congress authorized DOT to "prescribe motor vehicle safety standards" and "carry out needed safety research and development" under the National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act"), Pub. L. No. 89-563, 80 Stat. 718 (1966) (recodified as amended at 49 U.S.C. § 30101 et seq. ). DOT has delegated these duties to NHTSA. 49 C.F.R. § 1.95(a). NHTSA's regulatory mission is to "[s]ave lives, prevent injuries, and reduce economic costs due to road traffic crashes, through education, research, safety standards and enforcement activity." NHTSA's Core Values , National Highway Traffic Safety Administration, www.nhtsa.gov/about-nhtsa/nhtsas-core-values (last visited June 11, 2019).
¶13 The Safety Act contains dueling guidance on the issue of preemption. An express preemption clause directs that "a State may prescribe or continue in effect a standard *17 applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter," 49 U.S.C. § 30103(b)(1), while a saving clause states that "[c]ompliance with" a federal safety standard "does not exempt a person from any liability at common law," 49 U.S.C. § 30103(e). The Supreme Court has concluded, however, that "the saving clause does not foreclose or limit the operation of" implied obstacle preemption. Williamson , 562 U.S. at 329, 131 S.Ct. 1131.
¶14 To determine whether Dashi's lawsuit erects an obstacle in DOT and NHTSA's path to "the accomplishment and execution of ... [federal] purposes and objectives," id. at 330, 131 S.Ct. 1131 (quoting Hines , 312 U.S. at 67, 61 S.Ct. 399 ), we must first discern the purposes and objectives at issue. We thus examine the regulatory history, text and commentary, along with NHTSA's explanation of objectives and "current views" on preemption. See id. at 330-36, 131 S.Ct. 1131.
1. Regulatory History And Explanations Of Objectives
¶15 The record reveals DOT's and NHTSA's palpable and enduring interest in the development and deployment of AEB technologies, including FCW and CIB. NHTSA "began a thorough examination of the state of forward-looking advanced braking technologies" in 2010, "analyzing their performance and identifying areas of concern or uncertainty, in an effort to better understand their potential." Advanced Braking Technologies That Rely on Forward-Looking Sensors; Request for Comments , 77 Fed. Reg. 39,561, 39,562 (July 3, 2012). Since then, NHTSA has marshalled enormous amounts of data and information on AEB systems, collaborated with stakeholders and "continue[s] to explore test procedures and [the] effectiveness of these systems and to refine the performance criteria that should be used to assess these systems." Id. ; FMVSS AEB, 82 Fed. Reg. at 8391-94.
¶16 By 2012, NHTSA had concluded that "these technologies show promise for enhancing vehicle safety by helping drivers to avoid crashes or mitigate the severity and effects of crashes," and it "solicited comments on the results of its research thus far to help guide its continued efforts in this area." FMVSS AEB, 82 Fed. Reg. at 8392.
¶17 In recent years, NHTSA has used a diverse regulatory arsenal and assorted non-rulemaking tools to advance and achieve its AEB-related objectives, including to "improve vehicle safety" and "incentivize the installation of [AEB] technologies in a way that allows for continued innovation and technological advancement," while remaining "more responsive to safety issues and more proactive about preventing them." Id. at 8391, 8393-94. NHTSA expects this calibrated approach will "produce benefits substantially similar to those that would eventually result from the rulemaking." Id. at 8394.
¶18 NHTSA has "encouraged" and "incentivize[d]" light-vehicle manufacturers to install AEB technologies and has secured commitments from nearly all light-vehicle manufacturers, "representing more than 99 percent of light motor vehicle sales in the United States," to "voluntarily install[ ] forward crash warning and crash imminent braking" in their vehicles. Id. at 8391.
¶19 NHTSA has frequently issued "guidance documents to promote the development and adoption of safer designs of evolving, complex electronic vehicle safety systems." Id. at 8394 ; see infra ¶¶ 27-32. DOT and NHTSA released detailed policies with "vehicle performance guidance for automated vehicles" in 2016, 2017 and 2018, to accomplish two goals: "First, to make sure that new technologies are developed and deployed safely; and second, to leave room for flexibility and safety innovations." FMVSS AEB, 82 Fed. Reg. at 8394 ; see infra ¶¶ 27-32.
¶20 And beginning in 2011, NHTSA incorporated AEB technologies into the New Car Assessment Program ("NCAP"), a federal government program that tests and scores all new vehicles on safety criteria and publishes the information for consumers. Id. at 8392 ; see also 49 C.F.R. §§ 575.301 - 302. NHTSA has "used NCAP to encourage light vehicle manufacturers to offer, and consumers to demand, levels of crash protection above and *18 beyond those required by the safety standards." FMVSS AEB, 82 Fed. Reg. at 8394.
¶21 Then in 2015, NHTSA announced it would explore and pursue formal AEB requirements for large commercial vehicles, granting a petition for rulemaking to "establish a safety standard to require automatic forward collision avoidance and mitigation systems on certain heavy vehicles." Federal Motor Vehicle Safety Standard; Automatic Emergency Braking , 80 Fed. Reg. 62,487, 62,487 (Oct. 16, 2015). This process continues.
2. The Decision Not To Set Formal AEB Standards
¶22 Nissan's preemption argument emphasizes NHTSA's January 2017 refusal to set formal AEB standards for light-vehicle manufacturers. See FMVSS AEB, 82 Fed. Reg. at 8391. Consumer advocates filed a petition for rulemaking under 49 C.F.R. Part 552 in January 2016, asking NHTSA to "promulgate a safety regulation that will require all light vehicles to utilize three established and proven [AEB] technologies as standard equipment." Petition for Rulemaking: Requesting a Regulation to Require the Use of Automatic Emergency Braking Systems for Passenger Motor Vehicles , at 1 (Jan. 13, 2016). The consumer advocates asserted that "NHTSA ha[d] been studying the AEB technologies since the 1990s" and was "well aware that enhanced automobile safety technologies can prevent or substantially reduce the number of deaths and injuries caused by motor vehicle crashes." Id. at 2-3.
¶23 A year later, NHTSA and DOT denied the petition, refusing to "begin a rulemaking proceeding to mandate that all light vehicles be equipped with three types of automatic emergency braking (AEB) technologies." FMVSS AEB, 82 Fed. Reg. at 8391.
¶24 NHTSA made plain that its refusal to cement AEB standards did not signify a lack of interest. Just the opposite. NHTSA offered a full-throated endorsement of AEB technologies, touting their "important safety benefits" and life-saving "promise" to "prevent human choice or error from causing crashes," and describing them as "vital to automated vehicles." Id. at 8393-94. NHTSA emphasized its steadfast interest in the technologies, explaining it "ha[d] already invested substantial resources and taken significant steps to increase the installation of these technologies" and remained "focused on trying to accelerate the safe development and deployment of highly automated and connected vehicles." Id. at 8393.
¶25 Even so, NHTSA concluded that formal rulemaking was not flexible or responsive enough to achieve NHTSA's objectives. Id. at 8393-94. It stressed that AEB technology continues to "evolv[e] very quickly," and cautioned that formal rules and standard setting "must be undertaken with great care" to encourage and facilitate-rather than strangle or impede-the innovation, technological advancement and "introduction of successively better versions of these technologies." Id. at 8393. To that end, NHTSA described and heralded the success of its current regulatory efforts and non-rulemaking strategies, which it asserted "will lead to the installation of a growing array of AEB technologies in substantially all light vehicles and will foster innovation and competition in this technologically dynamic area." Id. at 8391.
3. Current Views On Preemption
¶26 Our final source is DOT's and NHTSA's express views on implied preemption. We do not have the benefit of an express agency position on this issue, but can glean their positions from the record and their amicus curiae briefs in Williamson .
Federal Automated Vehicle Policies
¶27 In recent federal policy documents on automated vehicles, DOT and NHTSA have delineated a "clear" division of state and federal roles for motor vehicle regulation, including in September 2016, when they stated that "DOT and the Federal Government are responsible for regulating motor vehicles and motor vehicle equipment, and States are responsible for regulating the human driver and most other aspects of motor vehicle operation." U.S. Department of Transportation & National Highway Traffic Safety Administration, Federal Automated Vehicles Policy: Accelerating the Next Revolution in Roadway Safety ("2016 Automated *19 Vehicles Policy "), at 38 (Sept. 2016). DOT "strongly encourage[d] States to allow DOT alone to regulate" the safety design and performance aspects of automated driving systems technology. Id. at 37. As relevant here, DOT said: "The Supreme Court has also found that State laws may be preempted if they stand as an obstacle to the accomplishment and execution of a NHTSA safety standard," even citing Geier in support. Id . at 38.
¶28 DOT reiterated this position in September 2017, drawing a bright line between the role of state and federal governments in regulating automated driving systems. "NHTSA remains responsible for regulating the safety design and performance aspects of motor vehicles and motor vehicle equipment; States continue to be responsible for regulating the human driver and vehicle operations." U.S. Department of Transportation & National Highway Traffic Safety Administration, Automated Driving Systems 2.0: A Vision for Safety ("Automated Driving Systems 2.0 "), at ii (Sept. 2017).
¶29 DOT responded to concerns raised by state governments that sought confirmation of NHTSA's authority and "reassurance that the Federal Government has tools to keep their roadways safe." Id. at 3. DOT emphasized that "NHTSA has broad enforcement authority to address existing and new automotive technologies and equipment," and the "enforcement authority concerning safety-related defects in motor vehicles and motor vehicle equipment extends and applies equally to current and emerging [automated driving systems]." Id. DOT reminded the public that NHTSA is "commanded by Congress to protect the safety of the driving public against unreasonable risks of harm that may arise because of the design, construction, or performance of a motor vehicle or motor vehicle equipment, and to mitigate risks of harm, including risks that may arise in connection with [automated driving systems]." Id.
¶30 DOT confirmed the 2016 and 2017 guidance in October 2018, restating that NHTSA has "broad authority over the safety of ... automated vehicle technologies equipped in motor vehicles," while advising that its authority extends to "establish[ing] Federal safety standards for new motor vehicles introduced into interstate commerce in the United States, and to address[ing] safety defects determined to exist in motor vehicles or motor vehicle equipment used in the United States." U.S. Department of Transportation, Preparing for the Future of Transportation: Automated Vehicles 3.0 ("Automated Vehicles 3.0 "), at 6 (Oct. 2018). And DOT again cited Geier , explaining that compliance with federal safety standards will not protect manufacturers from "tort liability for harm caused by negligent conduct," but "[t]he Federal standard would supersede if the effect of a State law tort claim would be to impose a performance standard on a motor vehicle or equipment manufacturer that is inconsistent with the Federal standard." Id.
¶31 Meanwhile, DOT warned that "[c]onflicting State and local laws and regulations surrounding automated vehicles [can] create confusion, introduce barriers, and present compliance challenges," id. at v, and acknowledged that NHTSA's equipment safety standards are "likely to raise questions about preemption and the future complementary mix of Federal, State and local powers," id. at 6. DOT described a balancing approach to these issues. "The Department will carefully consider these jurisdictional questions as NHTSA develops its regulatory approach to [automated driving system] and other automated vehicle technologies so as to strike the appropriate balance between the Federal Government's use of its authorities to regulate the safe design and operational performance of an [automated driving system]-equipped vehicle and the State and local authorities' use of their traditional powers." Id.
¶32 Dashi argues that the guidance documents only address "highly automated vehicles," such as "a Tesla," and are "irrelevant" to AEB systems, which she describes as the "lowest level" of automated technology.[4] But *20 the 2016 policy document instructs that its guidance "should generally apply to the full spectrum of automated vehicle systems," including "lower levels of automated vehicle systems," clarifying that manufacturers of lower levels of automation "should apply elements of this Guidance during product development, testing and deployment." 2016 Automated Vehicles Policy at 9-10, 31. The 2018 policy document likewise explains that DOT and NHTSA "consider[ ] automation broadly, addressing all levels of automation." Automated Vehicles 3.0 at vii. And in refusing to set formal AEB standards, NHTSA described AEB technologies as "vital to automated vehicles." FMVSS AEB, 82 Fed. Reg. at 8393-94.
DOT And NHTSA Amicus Briefs
¶33 Also instructive are DOT and NHTSA's amicus curiae briefs on the obstacle preemption issue in Williamson v. Mazda Motor of America, Inc. , 562 U.S. 323, 131 S.Ct. 1131, 179 L.Ed.2d 75 (2011).[5] The briefs stress the importance of whether the federal agency has deliberately preserved a manufacturer's choices to accomplish an important end or merely set a minimum safety standard, leaving manufacturers with the option to exceed the bare minimum of compliance. As regards the former, the federal government has "consistently" rejected preemption where any "purported 'option' ... [is] simply the byproduct of NHTSA's setting of a minimum standard," U.S. Amicus Brief II at 18-19, emphasizing that "[m]anufacturers always have the 'option' of exceeding a minimum safety standard when NHTSA has decided to permit, not to mandate, a more stringent alternative because of considerations of cost or feasibility," U.S. Amicus Brief I at 15.
C. Discerning The Federal Purposes And Objectives
¶34 The record shows that DOT and NHTSA are intensely interested in AEB technologies, having announced and pursued research and important regulatory objectives to encourage and expedite the innovation and deployment of safe and effective AEB systems.
¶35 We are persuaded by NHTSA's own words and commentary, its deliberate actions and accomplishments, its historical and current focus, and its informed refusal to set formal AEB standards at this moment. NHTSA has deliberately crafted and carefully calibrated a framework to achieve its objectives, using various non-rulemaking tools to achieve real success. NHTSA has pursued extensive negotiations with all light-vehicle manufacturers, issued formal guidance and worked to educate consumers about the importance of AEB systems. These calculated and meaningful efforts of federal regulators confirm NHTSA's longstanding, apparent interest in AEB technologies, and represent tangible proof of its overt, concrete goals to expand the universe of AEB-equipped vehicles and maximize the effectiveness of the life-saving technologies.
¶36 We construe NHTSA's refusal to set formal AEB standards as part and parcel of this regulatory approach, reflecting (1) its effort to balance the potential benefits and pitfalls associated with rapidly improving technologies, and (2) its conclusion that safety benefits will arise if manufacturers install alternative AEB systems rather than a singular system for all vehicles. See Hurley v. Motor Coach Indus., Inc. , 222 F.3d 377, 382 (7th Cir. 2000) (preemption turns on whether "the decision to leave options open to bus manufacturers was made with specific policy objectives in mind"); Hernandez-Gomez v. Volkswagen of Am., Inc. , 201 Ariz. 141, 145, 32 P.3d 424, 428 (App. 2001) (finding preemption where NHTSA regulation "gave manufacturers an unfettered choice among ... options" and state law action would eliminate choice and require manufacturers to install a certain option "to avoid common-law liability").
*21 As in Geier , NHTSA's decision reflects a thoughtful conclusion that "manufacturer choice [is] an important means for achieving its basic objectives," and will lead to the development of "alternative, cheaper, and safer" AEB systems. Williamson , 562 U.S. at 331-32, 131 S.Ct. 1131 (quoting Geier , 529 U.S. at 879, 120 S.Ct. 1913 ).
¶37 NHTSA expressly links its refusal to set formal AEB standards to safety concerns, which is important for preemption purposes. NHTSA states that its "non-rulemaking tools" are "help[ing] [it] accomplish two goals," including "to make sure that new technologies are developed and deployed safely," and "to leave room for flexibility and safety innovations." FMVSS AEB, 82 Fed. Reg. at 8394.
¶38 We are also persuaded by NHTSA's decision to move forward and set formal AEB standards for large commercial vehicles. At a minimum, it shows the federal government will cement formal AEB standards when it deems appropriate, based on its expertise and considered judgment.
¶39 Last, DOT and NHTSA have stressed their "broad enforcement authority to address existing and new automotive technologies and equipment," 2016 Automated Vehicles Policy at 46, and emphasized preemption principles in recent guidance on automated vehicles and automated technologies, including AEB systems, even citing Geier . They have reminded the states that Congress "commanded [NHTSA] to protect the safety of the driving public against unreasonable risks of harm that may occur because of the design, construction, or performance of a motor vehicle or motor vehicle equipment." Id.
D. Dashi's Common-Law Tort Claims Are Preempted
¶40 Turning to Dashi's tort claims, we must decide whether they would represent an obstacle to NHTSA's achievement of a significant regulatory objective. We conclude they would.
¶41 NHTSA has concluded there is room for improvement in automatic emergency braking system technologies before the federal government settles on a definitive formal standard. NHTSA declined to adopt formal AEB standards because it determined that driver safety-its core mission-is best served if NHTSA has regulatory space to use non-rulemaking tools rather than prematurely cement a definitive AEB standard, and manufacturers have regulatory space to choose between alternative AEB systems.[6] To that end, the record reflects a careful regulatory balance, where NHTSA accelerates the safe development and deployment of AEB systems in light vehicles, and encourages manufacturers to improve the safety and effectiveness of existing AEB technology, while preserving the regulatory agility to react and pivot as technology and circumstances warrant.
¶42 If successful, Dashi's design-defect and negligence claims would impose a duty on manufacturers whose vehicles drive in or through Arizona to install FCW and CIB systems or face liability from Arizona juries for making and peddling uncrashworthy vehicles. Dashi's claims would frustrate NHTSA's federal regulatory objectives by thrusting a jury-imposed AEB standard on Nissan inside Arizona's borders. The claims would disrupt NHTSA's careful balance, diminish its non-traditional efforts, compromise its ultimate safety goals, muzzle innovation and competition in this evolving space, and strip the federal government of leverage in NHTSA's ongoing negotiation efforts. Cf. Crosby v. Nat'l Foreign Trade Council , 530 U.S. 363, 377, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) ("Quite simply, if the Massachusetts law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence .... [T]he state Act reduces the value of the [bargaining] chips created by *22 the federal statute. It thus 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' ") (quoting Hines , 312 U.S. at 67, 61 S.Ct. 399 ).
¶43 Moreover, an Arizona-specific AEB standard might spawn a patchwork quilt of liability exposure, where a single AEB-unequipped vehicle on an interstate road-trip oscillates between crashworthy and possibly uncrashworthy as it navigates from one state to the next. As a practical matter, then, all manufacturers would immediately need to install FCW and CIB systems in their light vehicles.
¶44 At a minimum, the proliferation of state-specific AEB tort standards would pressure NHTSA to act, forcing its hand to pick a dispositive AEB standard before it is prepared to do so. Dashi's state tort claims are preempted.
E. Dashi's Counterarguments
¶45 Dashi asserts several arguments to defeat implied preemption. We examine each in turn.
1. Geier Applies Here
¶46 Dashi first argues Geier "does not apply here" because it involved nascent technology while, by contrast, AEB technologies were technologically "mature" in the mid-90's and presumably had no room for innovation. But the record provides otherwise. To begin, in refusing to set formal AEB standards, NHTSA described AEB equipment as a "technologically dynamic area," using the word "innovation" four separate times. Indeed, NHTSA refused to cement a singular standard at this moment because the technology continues to evolve, and it feared "inadvertently stymieing innovation and stalling the development and introduction of successively better versions of these technologies." FMVSS AEB, 82 Fed. Reg. at 8393-94.[7]
¶47 Dashi also contends that Geier is "distinctly different" because it involved "an actual rule, as required by the Act," rather than a denial of rulemaking. But implied conflict preemption turns on NHTSA's policy objectives, whether articulated in guidance documents or formal legislation. See Williamson , 562 U.S. at 330, 131 S.Ct. 1131. The Supreme Court has not limited obstacle preemption analysis to formal rules and regulations. To the contrary, Geier clarified that implied preemption does not require a "specific expression of agency intent to pre-empt, made after notice-and-comment rulemaking." 529 U.S. at 885, 120 S.Ct. 1913. What is more, the decision itself examined more than formal rules or legislation, including DOT's administrative comments, much to the dissent's chagrin. Id. at 887, 120 S.Ct. 1913.
¶48 Dashi's argument also misconstrues a denial of rulemaking petition as inconsequential, but these denials are reviewable in federal court, Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin. , 489 F.3d 1279, 1287 (D.C. Cir. 2007) (judicial review of NHTSA's denial of a petition for rulemaking begins in district court), and often represent, like here, the functional equivalent of an affirmative safety-motivated rule.
¶49 In sum, we reject the argument that informal efforts short of federal statutes or formal regulations are not enough to trigger obstacle preemption. Preemption is appropriate to ensure NHTSA can continue its flexible and responsive approach regarding AEB technologies without interference from state law tort actions.
2. Neither Sprietsma Nor Williamson Defeat Preemption
¶50 Dashi next argues that preemption does not apply here under Sprietsma v. Mercury Marine , 537 U.S. 51, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002), and Williamson v. Mazda Motor of America, Inc. , 562 U.S. 323, 131 S.Ct. 1131, 179 L.Ed.2d 75 (2011). We disagree.
¶51 Sprietsma harms rather than helps Dashi's cause. It confirms that implied obstacle preemption turns on deliberate federal *23 inaction, and instructs the courts to focus on why a federal agency decided not to constrain the choices of manufacturers. The plaintiff sued a boat manufacturer in state court for failing to install propeller guards, and the manufacturer moved to dismiss under implied obstacle preemption because the U.S. Coast Guard had decided not to regulate propeller guards, leaving the manufacturers to choose design options for themselves. Sprietsma , 537 U.S. at 54-55, 123 S.Ct. 518. The Supreme Court rejected preemption, however, because the Coast Guard was not motivated by concrete regulatory aspirations and "nothing in its official explanation would be inconsistent with a tort verdict premised on a jury's finding that some type of propeller guard should have been installed on this particular kind of boat." Id. at 67, 123 S.Ct. 518. Instead, the Coast Guard had simply decided that propeller guard regulations were unnecessary and unwarranted based on "available [accident] data" and the "stringent" requirements for federal regulation, along with cost concerns and uncertainties about a "universally acceptable" solution. Id. at 66-67, 123 S.Ct. 518.[8]
¶52 Most important, the Sprietsma Court recognized the "sharp contrast" to Geier , where NHTSA's refusal to regulate was driven by a "policy judgment that safety would best be promoted if manufacturers installed alternative protection systems in their fleets rather than one particular system in every car." Id. at 68, 123 S.Ct. 518 (quoting Geier , 529 U.S. at 881, 120 S.Ct. 1913 ).
¶53 So too here. NHTSA has abjured formal AEB standards at this time because it is convinced the technology is a game-changer for vehicle safety and wants to ensure that manufacturers have the breathing room to innovate until they get it right.
¶54 The same is true under Williamson , which only confirms that implied obstacle preemption requires a link between the federal "regulatory objective and the need for manufacturer choice to achieve that objective." Williamson , 562 U.S. at 338, 131 S.Ct. 1131 (J. Sotomayor, concurring). The plaintiffs there pressed tort claims against Mazda in state court for equipping a minivan's rear non-outboard seats with simple lap belts instead of lap-and-shoulder belts, and Mazda moved to dismiss based on implied obstacle preemption because NHTSA had authorized manufacturers to equip those seats with either simple lap belts or lap-and-shoulder belts. See id. The Supreme Court found no preemption because NHTSA had not deliberately preserved a choice for vehicle manufacturers under some grand design to advance significant federal policy objectives. Id. at 336, 131 S.Ct. 1131. Instead, in NHTSA's words, the relevant regulation had "simply set a minimum standard of [lap] seatbelts for rear inboard and aisle seats, based on its assessment at the time of technical feasibility and cost-benefit analyses." U.S. Amicus Brief I at 14-15.[9] As such, any choice left to manufacturers was merely a byproduct of NHTSA's minimum seatbelt standard, which necessarily left a choice for manufacturers to install the safer and more expensive option. Williamson , 562 U.S. at 335-36, 131 S.Ct. 1131.
¶55 At the same time, the Williamson Court reaffirmed Geier and distinguished between NHTSA's regulatory actions in Williamson and Geier . Id. at 330, 131 S.Ct. 1131 ("At the heart of Geier lies our determination that giving auto manufacturers a choice among different kinds of passive restraint devices was a significant objective of the federal regulation."). In particular and unlike in Geier , NHTSA had not preserved a choice for manufacturers in Williamson to select between two old-fashioned seatbelt options to "ensur[e] a mix of devices," id. at 333, 131 S.Ct. 1131, "lead[ing] to better information about the devices' comparative effectiveness and to the eventual development of 'alternative, cheaper, and safer passive restraint systems,' " id. at 331-32, 131 S.Ct. 1131 (quoting Geier , 529 U.S. at 879, 120 S.Ct. 1913 ).
¶56 NHTSA's actions in connection with AEB technology bear no resemblance to its *24 actions in Williamson . NHTSA did not set a minimum AEB standard; indeed, it refused to set any AEB standard. And manufacturers continue to have AEB choices because NHTSA determined that preservation of such choice represented the safest course forward "to make sure that new technologies are developed and deployed safely," and "to leave room for flexibility and safety innovation." FMVSS AEB, 82 Fed. Reg. at 8394.[10]
3. Dashi's Remaining Arguments Are Not Persuasive
¶57 Dashi argues that preemption is inappropriate because it would create "complete immunity from design defect liability to an entire industry," citing Medtronic, Inc. v. Lohr , 518 U.S. 470, 487, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). But Lohr was decided four years before Geier and 15 years before Williamson . And more broadly, we interpret Geier and Williamson to preempt only state tort claims against manufacturers for their choices relating to alternative safety technologies. Preemption does not, however, extend to tort claims if the device a manufacturer chooses to install does not work as intended. Thus, prospective plaintiffs can sue Nissan for designing and installing defective AEB systems in Nissan vehicles. See, e.g. , King v. Ford Motor Co. , 209 F.3d 886, 892 (6th Cir. 2000) ; 49 U.S.C. § 30103(e) ("Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law."); Geier , 529 U.S. at 868, 120 S.Ct. 1913 ("The saving clause assumes that there are some significant number of common-law liability cases to save.").
¶58 And last, Dashi contends that "state regulatory action can only be preemptive if NHTSA has promulgated a standard 'applicable to the same aspect of performance.' " But this language is pulled from the Safety Act's express preemption clause, which is not at issue here, and the Supreme Court has held that "the saving clause does not foreclose or limit the operation of" implied obstacle preemption. Williamson , 562 U.S. at 329, 131 S.Ct. 1131.
CONCLUSION
¶59 We affirm summary judgment for Nissan based on the doctrine of implied obstacle preemption.

Dashi refers to this technology as "automatic emergency braking," but we use the federal government's term.

The parties have identified minute entries in four other cases where the superior court has reached different conclusions on the implied preemption issue.

Passive restraints are safety devices (e.g., airbags or automatic seatbelts) that require no action from vehicle occupants.

We note that Dashi has taken inconsistent positions on the relevance of these documents, first offering the federal automated vehicle policies as a centerpiece of her argument in the opening brief, but later changing course in her reply brief.

The Solicitor General filed two amicus curiae briefs in Williamson at the Supreme Court's invitation. Brief for the United States as Amicus Curiae, 2010 WL 1653014 ("U.S. Amicus Brief I") ; Brief for the United States as Amicus Curiae Supporting Petitioners, 2010 WL 4150188 ("U.S. Amicus Brief II"). We take judicial notice of the briefs. Lake v. Memphis Landsmen, LLC , 405 S.W.3d 47, 66 (Tenn. 2013) (attaching "considerable weight" to the federal government's amicus brief in Williamson as "expressing the agency's view" on preemptive effect); MCI Sales & Serv., Inc. v. Hinton , 329 S.W.3d 475, 497, n.21 (Tex. 2010) (same).

Only months ago, Nissan drivers filed a federal class action lawsuit against Nissan for installing AEB systems in newer models that were ineffective, showing that AEB technologies continue to evolve and were not well established in 2009. See Class Action Complaint, Bashaw v. Nissan N. Am., Inc. et al. , Case No. 3:18-cv-07292-JCS, 2018 WL 6329394 (N.D. Cal. Nov. 30, 2018). We simply note the complaint was filed. See Regan v. First Nat'l Bank , 55 Ariz. 320, 327, 101 P.2d 214 (1940) ("courts [may] take judicial notice of other actions involving similar parties and issues and of the pleadings therein").

Dashi relies on a 1996 NHTSA report that used "mature" in connection with FCW technology, but her reliance is misplaced. The report never implies the technology is advanced or even purports to reach the issue. The report does, however, say that "collision avoidance systems" are in the "early stage" of development.

The Coast Guard itself also argued that its decision had no "preemptive effect." Id. at 68, 123 S.Ct. 518.

DOT, NHTSA and the Solicitor General thus shared their "current view" that the "regulation [did] not pre-empt this tort suit." Id. at 335-36, 131 S.Ct. 1131.

Dashi also relies on Freightliner Corporation v. Myrick , 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995), to argue the absence of federal regulation does not justify preemption. But Myrick was decided before Geier and Williamson . And unlike here, the Myrick Court had "no evidence that NHTSA decided that trucks and trailers should be free from all state regulation of stopping distances and vehicle stability." 514 U.S. at 286, 115 S.Ct. 1483.