IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

MELISSA VARELA,
*Plaintiff/Appellant,*

*v.*

FCA US LLC, et al.,
*Defendants/Appellees.*

No. 1 CA-CV 19-0209

FILED 5-5-2020

---

Appeal from the Superior Court in Maricopa County
No. CV2015-008635
The Honorable Connie Contes, Judge

**REVERSED IN PART; AFFIRMED IN PART; REMANDED**

---

COUNSEL

Shumway Law, PLLC, Phoenix
By G. Lynn Shumway, Christopher J. Zachar, Brent Ghelfi
*Counsel for Plaintiff/Appellant*

Bowman and Brooke, LLP, Phoenix
By Paul G. Cereghini, Travis M. Wheeler
*Counsel for Defendants/Appellees*

---

**OPINION**

Judge Diane M. Johnsen delivered the opinion of the Court, in which Presiding Judge Samuel A. Thumma and Judge Randall M. Howe joined.[1]

---

**J O H N S E N**, Judge:

¶1 Melissa Varela sued three automotive corporations (together "Chrysler") after a 2014 Jeep Grand Cherokee rear-ended her car at high speed, injuring her and killing her four-year-old daughter in the back seat. The Jeep was not equipped with automated collision-avoidance technology. Alleging negligence and product liability (defective design), Varela claimed the Jeep would not have collided with her car, or would not have collided with as much force, if it had been equipped with that technology.

¶2 The superior court granted Chrysler's motion to dismiss based on a doctrine called implied obstacle preemption. On appeal, Chrysler argues this court's recent decision in *Dashi v. Nissan North America, Inc.*, 247 Ariz. 56 (App. 2019), *rev. denied* (Ariz. Jan. 7, 2020), compels us to affirm. The facts and the nature of the allegations here, however, are different. We conclude Varela's claims are not preempted, reverse the dismissal and remand for further proceedings.[2]

---

[1]     Judge Johnsen was a sitting member of this court when the matter was assigned to this panel of the court. She retired effective February 29, 2020. In accordance with the authority granted by Article 6, Section 3, of the Arizona Constitution and pursuant to A.R.S. § 12-145 (2020), the Chief Justice of the Arizona Supreme Court has designated Judge Johnsen as a judge *pro tempore* in the Court of Appeals, Division One, for the purpose of participating in the resolution of cases assigned to this panel during her term in office.

[2]     Our jurisdiction over Varela's timely appeal arises from Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes sections 12-120.21(A)(1) (2020) and -2101(A)(1) (2020).

## DISCUSSION

**A.** **Implied Obstacle Preemption.**

**1.** **Introduction.**

**¶3**      Automakers now design, install and regularly sell cars that use technology to sense when a crash is likely ("forward collision warning") and to automatically apply the brakes to avoid or minimize the effects of a crash ("crash imminent braking"). *See* Federal Motor Vehicle Safety Standards; Automatic Emergency Braking, 82 Fed. Reg. 8391, 8392 (Jan. 25, 2017). The National Highway Traffic Safety Administration ("NHTSA") refers to these systems, together with "dynamic brake support," as "automatic emergency braking" ("AEB") technologies. *See id.* Chrysler offered its 2014 Jeep Grand Cherokee vehicle with five trim levels. AEB technologies were standard on the two most expensive models, optional on two other models, and not available at all on the least expensive model. The driver who collided with Varela's car drove one of the middle models but had not bought the option package that included AEB.

**¶4**      Chrysler argues Varela's tort claims are barred by implied obstacle preemption as a result of a "deliberate decision" by NHTSA in 2017 to decline to undertake a rulemaking process to mandate AEB technologies in new cars. As Chrysler argues, "NHTSA's refusal to set formal standards amounts to an authoritative decision to preserve manufacturer choice in whether and how to install AEB technologies."

**2.** **Legal principles.**

**¶5**      This court reviews *de novo* the "issues of law relating to alleged federal preemption of state law claims." *Conklin v. Medtronic, Inc.*, 245 Ariz. 501, 504, ¶ 7 (2018). Chrysler bears the burden of establishing its preemption defense. *See id.* at ¶ 8. As relevant, obstacle preemption occurs when a state common-law claim "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of a federal law or regulation. *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011) (citation omitted). Chrysler's argument here is not that Congress enacted a statute or a federal agency promulgated a rule that bars Varela's claims. Instead, Chrysler argues the claims are barred by NHTSA's decision *not* to regulate AEB technology, a subcategory of preemption called "implied obstacle preemption." *Dashi*, 247 Ariz. at 57, ¶ 1.

**¶6**      Implied obstacle preemption cases are rare; Chrysler relies primarily on *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000). At issue in that case was a 1984 federal safety standard requiring automakers "to equip some but not all of their 1987 vehicles with passive restraints" for occupants of passenger cars. *Id.* at

864-65. The driver of a 1987 Honda Accord and her parents sued the manufacturer, alleging her car was negligently and defectively designed without a driver's side airbag. *Id.* at 865. In addressing preemption, the Court first noted that under a "saving clause" in the National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act"), 15 U.S.C. § 1397(k) (1988) (recodified as amended at 49 U.S.C. § 30103(e) (2018)), "compliance with" a federal safety standard "does not exempt any person from any liability under common law." *Geier*, 529 U.S. at 867-68.[3] That provision allows common-law claims "that seek to establish greater safety than the minimum safety achieved by a federal regulation intended to provide a floor." *Id.* at 870. But the saving clause is of no help to a plaintiff making a claim that "actually conflicts" with a federal safety standard. *Id.* at 874.

¶7        The 1984 safety standard in *Geier* was premised on the reality that although "buckled up seatbelts are a vital ingredient of automobile safety," data showed that most front-seat passengers were not buckling up. *Id.* at 877. "[P]assive restraint[s]" that would replace or complement seatbelts could remedy the problem, but they had their own issues. *See id.* at 877-78. The public did not particularly like "nondetachable automatic belts," and airbags posed "special risks to safety," particularly for child passengers. *Id.* at 877. There also were expense concerns. *Id.* at 878. For these reasons, the United States Department of Transportation specifically rejected a proposal to require airbags in all cars. Instead, the Department set "a performance requirement for passive restraint devices [that allowed] manufacturers to choose among different passive restraint mechanisms . . . to satisfy that requirement." *Id.* at 878-79. By mandating that automakers install "a mix" of passive-restraint devices gradually, over time, the Department intended to allow time for manufacturers to develop "alternative, cheaper, and safer" passive-restraint devices. *Id.* at 879. Significantly, the Court noted, the United States Solicitor General had filed an *amicus* brief reporting the Department's view that the 1984 safety standard "embodies the Secretary's policy judgment that safety would best be promoted if manufacturers installed *alternative* protection systems in their fleets rather than one particular system in every car." *Id.* at 881.

¶8        Turning to the plaintiffs' defective-design claim, the *Geier* Court reasoned that "by its terms [the claim] would have required manufacturers of all similar cars to install airbags rather than other passive restraint systems, such as automatic belts or passive interiors." *Id.* The Court continued:

> It thereby would have presented an obstacle to the variety and mix of
> devices that the federal regulation sought. It would have required all

---

[3]       Absent material revision after the relevant date, we cite the current version of a statute or rule.

4

manufacturers to have installed airbags in [a geographic subset] of their 1987 new car fleet, even though [the standard] at that time required only that 10% of a manufacturer's nationwide fleet be equipped with any passive restraint device at all. It thereby also would have stood as an obstacle to the gradual passive restraint phase-in that the federal regulation deliberately imposed. . . . Because the rule of law for which [the plaintiffs] contend would have stood "as an obstacle to the accomplishment and execution of" the important means-related federal objectives that we have just discussed, it is pre-empted.

*Id.* at 881-82 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

¶9 The Supreme Court came to the opposite conclusion 11 years later, when it next addressed this variety of obstacle preemption in the context of highway safety. At issue in *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323 (2011), was a later version of the same safety standard in *Geier* that, by 1989, required automakers to install lap-and-shoulder belts in the rear seats of passenger cars next to the vehicle's doors or frames, but allowed simple lap belts in the rear inner seats. *Id.* at 326. The plaintiffs alleged a relative died in a traffic accident because the rear aisle seat of the minivan in which she was riding was equipped only with a lap belt, not a lap-and-shoulder belt. *Id.*

¶10 The *Williamson* Court acknowledged that, like the safety measure in *Geier*, the 1989 measure explicitly gave automakers a choice about which form of restraints to install. *Id.* at 332-33. But, in contrast to the earlier standard, when the Department of Transportation issued the 1989 standard, it was not concerned about building consumer acceptance or about the safety of lap-and-shoulder belts, so it had no interest in ensuring a mix of different restraint devices. *Id.* at 333. The record revealed that the primary reason for the Department's failure to require lap-and-shoulder belts in all rear inner seats in 1989 was that it thought such a requirement might not be cost-effective. *Id.* at 335. That judgment, the Court held, could not impliedly preempt a common-law claim:

[T]hat fact – the fact that [the Department] made a negative judgment about cost-effectiveness – cannot by itself show that [the Department] sought to forbid common-law tort suits in which a judge or jury might reach a different conclusion. . . . [T]o infer from the mere existence of such a cost-effectiveness judgment that the federal agency intends to bar States from imposing stricter standards would treat all such federal standards as if they were *maximum* standards, eliminating the possibility that the federal agency seeks only to set forth a *minimum* standard potentially supplemented through state tort law. We cannot

reconcile this consequence with a statutory saving clause that foresees the likelihood of a continued meaningful role for state tort law.

*Id.* at 335. At the same time, the Solicitor General informed the Court that, in contrast to the agency's view in *Geier*, the Department of Transportation did not believe the 1989 safety measure preempted the claim at issue. *Id.* ("[T]he agency's own views should make a difference." (quoting *Geier*, 529 U.S. at 883)).

### 3.     Varela's claims and NHTSA's decision to forego AEB rulemaking.

**¶11**         The safety standards at issue in *Geier* and *Williamson* both required installation of some passive restraints but allowed automakers to choose which specific device to install. *Williamson*, 562 U.S. at 326; *Geier*, 529 U.S. at 878-79. By contrast, at issue here is NHTSA's decision in 2017 *not* to require automakers to install any AEB technologies. In *Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002), the Supreme Court unanimously held that a federal agency's decision to refrain from mandating a national standard does not, without more, impliedly preempt a state common-law tort action.

**¶12**         The plaintiff *Sprietsma* alleged an outboard motor was defectively designed because it lacked propeller guards. *Id.* at 54-55. Like Chrysler in this case, the manufacturer argued that a decision by the relevant federal agency (the Coast Guard) not to adopt a regulation requiring propeller guards impliedly preempted the claim. The Court rejected that contention: "It is quite wrong to view that decision as the functional equivalent of a regulation prohibiting all States and their political subdivisions from adopting such a regulation." *Id.* at 65.

**¶13**         As in *Geier* and *Williamson*, the Court in *Sprietsma* examined the basis for the federal entity's decision. *See id.* at 66. Among the reasons the Coast Guard cited for declining to mandate propeller guards was that the data did not support such a regulation, there were questions about whether "a universally acceptable propeller guard" would be feasible, and it would be expensive to retrofit boats with propeller guards. *Id.* Nothing in this explanation, the Court concluded, "would be inconsistent with a tort verdict premised on a jury's finding that some type of propeller guard should have been installed on this particular . . . type of motor." *Id.* at 67. To the contrary, as the Court noted, the Solicitor General informed the Court that the Coast Guard did not view its decision as impliedly preempting a common-law claim based on the absence of a propeller guard. *Id.* at 68.

**¶14**         Turning to the claims at issue here, by 2017, NHTSA, as authorized by the Department of Transportation, had been studying AEB technologies for at least ten years. Automatic Emergency Braking, 82 Fed. Reg. at 8392; 49 C.F.R. § 1.95(a). In 2011, NHTSA added "forward collision warning" to its New Car Assessment Program ("NCAP"), a program by which it evaluates new cars'

performance on various safety tests and reports the results to the public. *Id.*; *see generally* Consumer Information; New Car Assessment Program, 73 Fed. Reg. 40,016 (July 11, 2008). In 2015, NHTSA added to NCAP two additional AEB technologies, "crash imminent braking" and "dynamic brake support." Automatic Emergency Braking, 82 Fed. Reg. at 8392. That same year, NHTSA announced a commitment by ten automakers to voluntarily install AEB in their new cars, and followed that in 2016 by announcing a commitment by 20 automakers, "representing more than 99 percent of light motor vehicle sales in the United States," to voluntarily install AEB in substantially all their light motor vehicles by 2022. *Id.* at 8392-93.

¶15 A consumer group petitioned NHTSA "to initiate a rulemaking to issue a safety standard requiring that light vehicles be equipped" with AEB technologies. *Id.* NHTSA's denial of the petition was no rejection of AEB. To the contrary, the agency's written decision endorsed AEB as a powerful means of improving roadway safety but asserted that, given the huge strides automakers already had made in developing and installing AEB technologies, it did not need to issue a formal rule to further promote AEB. *Id.* at 8393-94. NHTSA observed that its decision to incorporate AEB performance standards in NCAP, along with the responses of private ratings services to the agency's publication of safety ratings issued to AEB devices in new vehicles, had caused automakers voluntarily "to increase their installation of AEB technologies and to improve their performance." *Id.* at 8394. Indeed, NHTSA observed that a formal rulemaking process might cause a delay of three years or more before AEB technologies would be standard in new cars. *Id.* That being the case, and given its limited resources, the agency concluded it should devote its rulemaking energies to other initiatives, including even more advanced motor-vehicle technologies. *Id.* at 8393-94.[4]

¶16 As NHTSA's decision noted, Chrysler is one of many manufacturers that voluntarily agreed to install AEB technologies in their new cars. *Id.* at 8393, n.2. Having developed and tested AEB for its Jeep Grand Cherokee, the company submitted its 2014 model for NHTSA's new-car review through NCAP. The agency found the AEB that Chrysler offered with its 2014 Jeep had been "either verified by NHTSA or reported by the vehicle manufacturer[] as meeting" the agency's performance criteria, and NHTSA's website reported the favorable result under a

---

[4] We note that NHTSA recently commenced a rulemaking aimed at adapting existing vehicle safety standards to driverless cars. *See* "Occupant Protection for Automated Driving Systems," Docket No. NHTSA-2020-0014, issued March 16, 2020. In announcing that rulemaking, NHTSA expressly stated that it did not intend its proposal to impliedly preempt a state-law tort claim premised on a higher safety standard. *Id.* at 75.

heading titled "Recommended Safety Technologies." *2014 Jeep Grand Cherokee: SUV 4WD*, Nat'l Highway Traffic Safety Admin., https://www.nhtsa.gov/vehicle/2014/JEEP/GRAND%252520CHEROKEE/SUV /4WD (last visited Feb. 27, 2020).

¶17 Varela alleges that, having designed and installed AEB as a standard feature on its highest-end 2014 Grand Cherokees, Chrysler negligently and defectively designed its other 2014 Grand Cherokee models by offering AEB technologies, if at all, only as an option for which buyers would have to pay extra. As Varela puts it, Chrysler should not have "option[ed] safety" by declining to make its AEB standard on all trim packages of the 2014 Grand Cherokee. The specifics of Varela's claims – particularly when juxtaposed against NHTSA's explanation for declining to undertake AEB rulemaking – control our analysis of whether the agency's denial of the petition in 2017 deserves preemptive effect, as in *Geier* and *Dashi*, or is more akin to the agency actions in *Sprietsma* or *Williamson*, which did not preempt common-law claims.

¶18 It is not disputed that Chrysler designed an AEB system that met NHTSA's NCAP performance criteria but installed that system as standard in only two of the five models of its 2014 Jeep Grand Cherokee. Unlike the plaintiff in *Geier*, Varela does not challenge the automaker's choice to install one safety device over another in the face of an agency action mandating a mix of devices. That is, she does not allege the 2014 Grand Cherokee that hit her car was defective because it came with an AEB design that was inferior to another AEB design. Nor, given the NCAP approval of the AEB that Chrysler installed in some of its 2014 Grand Cherokees, will the finder of fact in this case be asked to set a performance standard for AEB technologies, an issue the claim in *Dashi* might have presented. Varela's only contention is that, having won NHTSA's effective approval for its AEB design during the NCAP process, Chrysler should have installed that design as a standard feature on all models of its 2014 Grand Cherokees and that its failure to do so was negligent and a design defect.

¶19 Given NHTSA's public confirmation that Chrysler's AEB satisfied the agency's performance criteria in 2014, we cannot conclude that NHTSA's decision to eschew a formal AEB rulemaking impliedly preempts Varela's contention that Chrysler should have installed that same technology on the Jeep at issue here. This is particularly true because NHTSA's refusal to commence an AEB rulemaking in 2017 was premised primarily on the agency's conclusion that automakers were moving forward so quickly with AEB that it did not need to issue a formal rule to compel them to do so. Automatic Emergency Braking, 82 Fed. Reg. at 8394-95. And, unlike in *Geier*, we have nothing in our record from NHTSA informing us that when it decided against undertaking an AEB rulemaking in 2017, it intended to preempt tort claims based on the absence of AEB. To the contrary,

NHTSA's explanation for its decision recounts its long history of encouraging automakers to develop AEB technologies; its decision to refrain from issuing a rule was not driven by uncertainty about whether automakers should install AEB, or about what design of AEB to install, but instead by the agency's apparent delight at automakers' embrace of AEB technologies of all designs. *See id.*

¶20 As *Williamson* put it, a tort claim that would restrict a choice left open by agency action is impliedly preempted only when "that choice is a significant regulatory objective." 562 U.S. at 332. Nothing in NHTSA's 2017 decision even hints of a "regulatory objective" by the agency to delay automakers' installation of AEB technologies that have met its performance standards.[5]

¶21 Chrysler argues that allowing Varela's claims and others like it would stymie automakers' "freedom to continue to innovate and increase consumer safety." It contends that when a manufacturer introduces such technology on a limited basis, it can use its resulting experience to "discover any unintended consequences" while it further refines the technology. Nothing in our record or in NHTSA's written decision, however, shows that NHTSA intended to foreclose liability under circumstances such as this. Nor do we accept Chrysler's contention that allowing Varela's claims would effectively punish it for developing and installing AEB technology or reward hypothetical other "manufacturers for offering *no* AEB technologies on their vehicles." The voluntary industry commitments that NHTSA trumpeted in deciding to forego rulemaking demonstrate that automakers face enormous competitive pressures to develop and install technologies that will win the agency's recommendation in the NCAP process and the marketplace.

¶22 For these reasons, we conclude that NHTSA's refusal to undertake an AEB rulemaking in 2017 does not impliedly preempt Varela's common-law claims. This result is fully consistent with "a congressional determination that occasional nonuniformity is a small price to pay for a system in which juries not only create, but also enforce, safety standards, while simultaneously providing necessary compensation to victims." *Geier*, 529 U.S. at 871.

---

[5] Under Arizona Rule of Evidence 201, this court takes judicial notice of a 2017 Department of Transportation report to Congress vigorously endorsing automakers' voluntary commitment to install AEB technologies "in virtually all passenger vehicles by 2022." U.S. Dep't of Transp., *The U.S. Department of Transportation's Status of Actions Addressing the Safety Issue Areas on the NTSB's Most Wanted List* 7 (2017). The Department continued, "The historic voluntar[y] commitment ensures that this lifesaving technology is incorporated into vehicles faster than through traditional regulatory channels, and not just as a high-end luxury option." *Id.*

## B.  Protective Order Precluding Deposition.

**¶23**         Varela also appeals from the superior court's order granting Chrysler a protective order pursuant to Arizona Rule of Civil Procedure 26(b)(1) precluding a deposition of Mark Chernoby, Chrysler's chief technical compliance officer.

**¶24**         Pursuant to Rule 30(b)(6), Varela had served a deposition notice on the company seeking testimony on 92 topics, and Chrysler produced three company representatives with management roles in overseeing the Grand Cherokee, who testified about the design, development, testing, functionality and rollout of Chrysler's AEB systems in that vehicle.   Varela also deposed two additional Chrysler employees who testified in their individual capacities about the company's AEB systems.

**¶25**         Varela then sought to depose Chernoby, who at the time reported directly to Chrysler's chief executive officer.  Varela asserted she wanted to depose Chernoby about decisions the company made in rolling out AEB technologies through its fleet generally and about a quotation attributed to him in a 2014 company press release.[6]

**¶26**         In moving for a protective order, Chrysler protested that Chernoby had no "genuinely relevant knowledge" that Varela could not obtain from other witnesses or other means of discovery.  According to an affidavit Chernoby submitted with the motion, he was Vice President Engineering & Product Committee Coordinator, referring to the committee that had accepted the recommendation of  a "cross-functional team" about what trim levels of the 2014 Grand Cherokee "would receive [AEB] as either standard or optional equipment." Chernoby averred that he had no recollection of any discussion about AEB during a key meeting in April 2011 at which the 2014 Jeeps were discussed.  Further, he stated that two of the witnesses Chrysler produced in response to the Rule 30(b)(6) deposition notice were members of that cross-functional team, and, after reviewing their testimony, he stated that he had no knowledge or information concerning the AEB roll-out that "is any way superior or more detailed" than those witnesses.

**¶27**         In response to the motion, Varela argued that the company had yet to allow her to depose any witness about Chrysler's "overall corporate policies and strategies with respect to" AEB, "including an overall corporate strategy for introduction of the feature."  Chrysler countered that, by noticing Chernoby's

---

[6]     The statement attributed to Chernoby in the press release was, "Chrysler Group takes seriously its commitment to providing innovative and intuitive driver-assistance features to the mainstream market segments."

deposition, Varela effectively sought to dictate whom the company would produce as a Rule 30(b)(6) witness about company-wide strategy and policy issues.

¶28    After full briefing and oral argument, the superior court granted the motion to preclude the Chernoby deposition but ruled that Chrysler would need to produce a Rule 30(b)(6) witness knowledgeable about overall corporate strategy issues with respect to AEB.

¶29    The court did not abuse its discretion.  *See Brown v. Superior Court*, 137 Ariz. 327, 331-32 (1983).  Varela did not dispute Chrysler's assertions that Chernoby lacked knowledge about why Chrysler as a corporation decided to introduce AEB across its range of vehicles in the manner it did.  And in granting the protective order, the court made clear that it would enforce a Rule 30(b)(6) deposition on that topic.  *See* Ariz. R. Civ. P. 30(b)(6) (Upon service of a deposition notice that "describe[s] with reasonable particularity the matters for examination, . . . [t]he named entity must then designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf.").

## CONCLUSION

¶30    For the reasons stated, we reverse the judgment in favor of Chrysler, affirm the protective order and remand for further proceedings.  Varela is entitled to her costs on appeal, contingent on compliance with Arizona Rule of Civil Appellate Procedure 21.

