IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**MELISSA VARELA**,
*Plaintiff/Appellant*,

*v.*

**FCA US LLC, ET AL.**,
*Defendants/Appellees.*

No. CV-20-0157-PR
Filed March 1, 2022

Appeal from the Superior Court in Maricopa County
The Honorable Connie Contes, Judge
No. CV2015-008635
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division One
249 Ariz. 89 (2020)
**AFFIRMED; VACATED IN PART**

COUNSEL:

G. Lynn Shumway, Shumway Law PLLC, Phoenix; Brent Ghelfi (argued), Ghelfi Law Group, PLLC, Phoenix; and Christopher J. Zachar, Zachar Law Firm, P.C., Phoenix, Attorneys for Melissa Varela

Paul G. Cereghini, Travis M. Wheeler, Bowman and Brooke LLP, Phoenix; and Thomas H. Dupree, Jr. (argued), Gibson Dunn, Washington, DC, Attorneys for FCA US LLC, LVN Motors LLC, and PV Holding Corporation

David L. Abney, Ahwatukee Legal Office, P.C., Phoenix, Attorney for Amici Curiae Arizona Association for Justice and Arizona Trial Lawyers Association

Larry E. Coben, Anapol Weiss, Scottsdale, Attorney for Amici Curiae Center for Auto Safety and Consumers for Auto Reliability and Safety

Patrick X. Fowler, Ashley Wiberg, Snell & Wilmer LLP, Phoenix; and Nicole A. Saharsky, Eric A. White, Mayer Brown LLP, Washington, DC, Attorneys for Amici Curiae PLAC and Alliance for Automotive Innovation

Thomas M. Klein, Briana L. Campbell, Klein Thomas & Lee, Phoenix, Attorneys for Amicus Curiae Nissan North America, Inc.

JUSTICE MONTGOMERY authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK, LOPEZ, and BEENE joined.

JUSTICE MONTGOMERY, opinion of the Court:

**¶1**        Under the Supremacy Clause of the Federal Constitution, when a state law conflicts with a properly enacted federal law, the state law is preempted.  State law includes duties imposed by state tort law.  Federal law includes regulations promulgated by executive agencies under authority delegated by Congress.  Preemption may also occur in the absence of a regulation under the doctrine of implied obstacle preemption when state tort law conflicts with a clear federal policy objective established by an executive agency acting within properly delegated authority.

**¶2**        At issue in this case is whether, in the absence of a promulgated safety regulation, the National Highway Transportation Safety Administration (the "Agency") has established a clear policy objective concerning automatic emergency breaking ("AEB") technology that preempts state tort law claims based on an auto manufacturer's alleged failure to install AEB.  We hold that, based on the facts and allegations in this case and the administrative record before us, the Agency has not established a policy objective that actually conflicts with the claims at issue.  Thus, the claims are not preempted.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

¶3         In 2015, a 2014 Jeep Grand Cherokee traveling at high speed rear-ended Melissa Varela's stopped car, despite the Jeep driver's last-moment attempt to brake and steer clear.  The collision injured Varela and killed her four-year-old daughter, Vivian.  The Jeep that struck Varela's car was a Jeep Grand Cherokee "Limited" that was not equipped with forward collision warning plus ("FCW+"), which is also referred to as AEB.[1]  FCW+ was available as an option on the Limited and Overland trim level versions of the Grand Cherokee and was a standard feature on the Summit and SRT trim levels.

¶4         Varela sued FCA US LLC, LVN Motors, LLC, and PV Holding Corp. (collectively "Chrysler"), alleging negligence, defective product design, defective product warning, and wrongful death.  Varela asserted that the collision would not have occurred, or at least would have caused less damage, if the Jeep had been equipped with FCW+.  Chrysler moved to dismiss the lawsuit, asserting it was preempted pursuant to implied obstacle preemption given the Agency's objectives regarding the development and deployment of AEB technology, which do not mandate AEB installation on vehicles such as the Jeep.  Relying on policy guidance published by the Agency in 2016 and 2017, as well as the Agency's denial of a petition to regulate AEB in 2017, the trial court granted Chrysler's motion.  The court reasoned that the referenced documents "reflect[ed] the federal government's intention to preempt this field 'to incentivize the installation of these technologies in a way that allows for continued innovation and technological advancement.'"

---

[1] AEB encompasses the components of FCW+, which consists of: forward collision warning ("FCW") that alerts the driver through light, audio, or haptic feedback signals that a collision is likely; crash imminent braking that activates braking when the driver has failed to apply force to the brake pedal when a crash is likely or unavoidable; and dynamic brake support that activates braking when the driver has not applied sufficient force to the brake pedal.  Federal Motor Vehicle Safety Standards; Automatic Emergency Braking, 82 Fed. Reg. 8391, 8392 (petition for proposed rulemaking denied Jan. 25, 2017).

**¶5**        The court of appeals reversed after finding that "nothing in [the] record" indicated the Agency's intention to "preempt tort claims based on the absence of AEB." *Varela v. FCA US LLC*, 249 Ariz. 89, 95 ¶ 19 (App. 2020). Based on the facts and allegations in this case, the court distinguished its conclusion from a contrary one reached by a different panel in *Dashi v. Nissan North America, Inc.*, 247 Ariz. 56 (App. 2019) (finding claims based on an alleged failure to install AEB preempted under the doctrine of implied obstacle preemption). *Varela*, 249 Ariz. at 91 ¶ 2.

**¶6**        We accepted review because this case involves an issue of statewide importance concerning the federal preemption of state tort law, and because different panels of the court of appeals have issued conflicting opinions. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution. We review issues of law concerning the federal preemption of state tort law claims de novo. *See Conklin v. Medtronic, Inc.*, 245 Ariz. 501, 504 ¶ 7 (2018).

## II. DISCUSSION

### A. Preemption in General

**¶7**        The Supremacy Clause of the Federal Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Federal law may therefore preempt an otherwise valid state law. *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2262 (2020) ("'[T]his Clause creates a rule of decision' directing state courts that they 'must not give effect to state laws that conflict with federal law[ ].'" (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015))). State law, for purposes of conflict preemption analysis, includes duties imposed as a result of state tort law. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000).

**¶8**        Preemption generally occurs in one of two ways. *Id.* at 884. Express preemption occurs when federal lawmakers explicitly state that related state law is preempted. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). Preemption can also be implied, *Geier*, 529 U.S. at 884, which can manifest in one of three forms. Field preemption occurs "when the scope of a [federal] statute indicates that Congress intended federal law

4

to occupy a field exclusively." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)). A second form is based on impossibility where "it is impossible . . . to comply with both state and federal [legal] requirements." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). The third form is obstacle preemption, when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

¶9        Federal regulations, in addition to laws passed by Congress, may also preempt state laws. *Sprietsma v. Mercury Marine,* 537 U.S. 51, 65 (2002) (stating that if a state common-law claim directly conflicted with a federal regulation promulgated under the Federal Boat Safety Act, or if it were impossible to comply with any such regulation without incurring liability under state common law, preemption would occur). Obstacle preemption may also occur when a federal agency, acting pursuant to authority delegated by Congress, decides *not* to regulate a particular matter, so long as its corresponding explanation for the decision conveys an "authoritative" message of preemptive federal objectives. *Id.* at 66–67 (acknowledging that "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate" (quoting *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n,* 461 U.S. 375, 384, (1983))); *see also Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155 (1982) (finding that a state's limitation on the use of optional "due-on-sale clauses" in federal savings and loans contracts presented an actual obstacle to regulatory policy "authorizing [but not requiring] federal savings and loan associations to enforce due-on-sale clauses 'subject only to express limitations imposed by the [Federal Home Loan Bank] Board'"). Thus, in the specific instance of obstacle preemption, although a court must identify an "actual conflict," an express statement of preemptive intent is not necessary. *Geier*, 529 U.S. at 884.

¶10        Chrysler has the burden of establishing preemption. *Conklin v. Medtronic, Inc.*, 245 Ariz. 501, 504 ¶ 8 (2018).

### B. Administrative Record

¶11        Chrysler contends that the administrative record reflects purposeful action on the part of the Agency to establish a policy to refrain

from requiring manufacturers to equip vehicles with AEB, to leave room for manufacturer flexibility in implementing and innovating AEB technology, and to leave the regulation of automated vehicle systems to the federal government rather than the states. Additionally, Chrysler asserts that published guidance documents and the denial of a petition for proposed rulemaking to regulate AEB in 2017 make it clear that the Agency sought to "ensure safety advances in AEB technologies by eschewing a design requirement in favor of giving manufacturers the freedom to innovate and improve." Therefore, according to Chrysler, Varela's state tort claims which would require AEB installation conflict with the Agency's policy goals. Varela argues that the record reflects a policy to encourage rapid adoption and implementation of AEB and that the published guidance provides no evidence of preemptive intent. Thus, her suit is not preempted.

¶12 While it is not necessary to have "a specific, formal agency statement identifying [a] conflict" to conclude that one exists, *Geier*, 529 U.S. at 884, evidence of a preemptive intent or purpose must be clear, *id.* at 885, and "convey an 'authoritative' message of a [preemptive] federal policy," *Sprietsma*, 537 U.S. at 67. The conflict cannot simply be a consequence of a secondary regulatory consideration or something simply permitted under the regulatory status quo that was not purposefully sought in pursuit of significant regulatory goals. *See Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 338 (2011) (Sotomayor, J., concurring) (explaining that the "mere fact" a regulation permits an option to manufacturers does not mean that this option is a preemptive "regulatory objective").

¶13 We presume that federal lawmakers do not "cavalierly pre-empt" state law because "the States are independent sovereigns in our federal system," *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), and have historically "had great latitude" to protect "the lives, limbs, health, comfort, and quiet" of their citizens, *id.* at 475 (quoting *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)). This presumption against preemption is "particularly" strong in "field[s] which the States have traditionally occupied," *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Lohr*, 518 U.S. at 485), such as adjudicating "common-law tort actions," *Geier*, 529 U.S. at 887 (Stevens, J., dissenting) (describing this function as part of the "traditional jurisdiction" of "state courts").

**¶14**        Accordingly, "[c]ourts must cautiously approach this interpretive task" and avoid stitching together the fragmentary musings of federal lawmakers into a preemptive purpose that does not exist and was not intended.[2] *See MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 483 (Tex. 2010).  Indeed, such a "freewheeling judicial inquiry" risks "undercut[ting] the principle" that Congress (acting on its own or through a federal agency) preempts state law, not the courts.  *Chamber of Comm. v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment)).

**¶15**        We underscore the need for interpretive caution with a few additional points.  As mentioned, the Supremacy Clause, according to its plain language, comes into effect when federal "Laws . . . made in Pursuance" of the Constitution and a state law are contrary.  U.S. Const. art. VI, cl. 2.  But to be "made in Pursuance" of the Constitution, *id.*, federal law must adhere to certain procedural requirements, namely the Bicameral and Presentment Clauses, *Wyeth*, 555 U.S. at 585–6 (Thomas, J., concurring) (citing U.S. Const. art. I, § 7, cls. 2–3).  The Framers designed this "step-by-step, deliberate and deliberative process" to prevent "arbitrary governmental acts" from going "unchecked" and thereby "protect[ing] the people from the improvident exercise of power."  *I.N.S. v. Chadha*, 462 U.S. 919, 957, 959 (1983).

**¶16**        Implied preemption stands in tension with these procedural requirements because under that doctrine, state law is preempted not by what is expressed in federal law, but rather by what may be implied by federal law.  Though such implications can certainly arise from the text of federal law, they necessarily exist outside of it.  By venturing beyond the text of federal law, courts risk preempting state law based on something

---

[2] We keep this cautionary note in mind particularly because the right to seek redress for injury in Arizona is a constitutional right.  Ariz. Const. art. 18, § 6 ("The right of action to recover damages for injuries shall never be abrogated . . . ."); *Cronin v. Sheldon*, 195 Ariz. 531, 538 ¶ 35 (1999) ("[A]rticle 18, § 6 prevents abrogation of all common law actions for negligence, intentional torts, strict liability, defamation, and other actions in tort which trace origins to the common law."); *see also* Ariz. Const. art. 2, § 31 ("No law shall be enacted in this state limiting the amount of damages to be recovered for causing the death or injury of any person.").

other than what has been "made in Pursuance" of the Constitution. When that happens, the consequences are two-fold. First, the preemption of state law effects "a serious intrusion into state sovereignty," *Medtronic*, 518 U.S. at 488, and implying preemption too broadly may impinge on this sovereignty where unwarranted, thereby usurping the residual power that the Constitution guarantees to the states. *See Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 44 (2007) (Stevens, J., dissenting) (explaining that preemption "affects the allocation of powers among sovereigns"); *see also* The Federalist No. 33, at 172 (Alexander Hamilton) (Clinton Rossiter ed., 1999) (noting that acts of the federal government "which are not pursuant to its constitutional powers" are "invasions of the residuary authorities [of the states]" and "acts of usurpation"). Second, beyond siphoning governmental power reserved for the states, implying preemption too readily risks usurping legislative authority to enact laws and, when the federal law at issue stems from an agency within the executive branch, it improperly inflates executive power as well. *See Lipschultz v. Charter Advanced Servs. (MN), LLC*, 140 S. Ct. 6, 7–8 (2019) (denial of cert.) (Thomas, J., concurring) (doubting that an executive agency's policy can be preemptive law under the Supremacy Clause).

¶17　　　　Altogether, liberally applying implied preemption destabilizes the twin pillars of our constitutional order: federalism and the separation of powers. Accordingly, courts must be vigilant and avoid speculative conflicts far removed from the text of laws and authorized regulations and carefully adhere to what is in, or necessarily follows from, the text of federal law. *See Rice v. Norman Williams Co.*, 458 U.S. 654, 659

(1982) ("The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute.").[3]

**¶18**     Mindful of the need for caution, we now turn to reviewing the administrative record. Our task is to determine whether the Agency has conveyed an authoritative message establishing a federal policy of maintaining manufacturer choice for the development and deployment of AEB technology, has determined that AEB is best left unregulated, and that any AEB regulation is an exclusive federal responsibility. The record consists of information from the New Car Assessment Program (the "Program"), guidance published by the Department of Transportation ("DOT") and the Agency from 2016 to 2020,[4] and the Agency's denial of a 2017 petition for rulemaking that would have required installation of AEB technology on all light vehicles, including vehicles like the Jeep Grand Cherokee. We also have two notices of proposed rulemaking issued by the Agency in March and December of 2020.

---

[3] Members of the U.S. Supreme Court have called the implied obstacle preemption doctrine into further question. The doctrine, they argue, "rests on judicial guesswork about 'broad federal policy objectives, legislative history, or generalized notions of congressional purposes,'" rather than the text of federal law, which is what the Supremacy Clause explicitly references. *Kansas v. Garcia*, 140 S. Ct. 791, 808 (2020) (Thomas, J., concurring); *see also Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907–08 (2019) (plurality opinion) (reasoning that because of the "speculation" inherent in obstacle preemption, courts must be careful not to "displac[e] perfectly legitimate state laws on the strength of 'purposes' that only [courts] can see, that may seem perfectly logical to [this Court], but that lack the democratic provenance the Constitution demands before a federal law may be declared supreme"); Caleb Nelson, PREEMPTION, 86 Va. L. Rev. 225, 232 (2000) (discussing preemption doctrine and concluding that "a general doctrine of obstacle preemption is misplaced").

[4] For simplicity, we will only refer to the Agency when referencing guidance documents.

### 1. The Program

**¶19** Varela points to the Program as evidence of the Agency's goal to encourage accelerated deployment of the relevant technology. Chrysler rejects any use of the Program as a source for setting an AEB standard.

**¶20** Pursuant to Title II of the Motor Vehicle Information and Cost Savings Act of 1972, the Agency established the Program in 1978. Consumer Information; New Car Assessment Program, 73 Fed. Reg. 40015, 40016 (July 11, 2008). As the Program requires, the Agency compiles the results of safety testing and shares the information with consumers in the form of a five-star rating system, which consumers can then reference when making a choice about which car to buy. *Id.* Manufacturers, in turn, "respond to the ratings by voluntarily improving the safety of their vehicles beyond the minimum Federal safety standards." *Id.*

**¶21** Beginning in model year 2010, the Agency identified FCW as one of several technologies for inclusion in a program for rating crash avoidance. *Id.* at 40033. By 2015, the Program incorporated each element of AEB among recommended crash avoidance technologies. New Car Assessment Program, 80 Fed. Reg. 68604 (Nov. 5, 2015). As characterized by the Agency, the Program, in conjunction with efforts to encourage manufacturers to voluntarily install AEB, helps to "create availability and market push for AEB technologies." Federal Motor Vehicle Safety Standards; Automatic Emergency Braking, 82 Fed. Reg. 8391 (petition for proposed rulemaking denied Jan. 25, 2017). At best, then, the Program reflects the Agency's efforts to inform vehicle purchasers about current safety elements in vehicles that, in turn, encourage auto manufacturers to make their products as safe as possible. The Program is therefore not a means of establishing safety standards nor does it serve to communicate any preemptive intent regarding AEB.

### 2. Policy Guidance

**¶22** From 2016 to 2020, the Agency published a series of documents providing guidance with respect to automated vehicles and

automated driving systems.[5]   According to Chrysler, "[t]he federal guidance documents are a critical part of the regulatory record because they show that [the Agency] views regulation of the design of automated vehicles and vehicle systems as an area of exclusive federal responsibility," as well as the Agency's belief that voluntary compliance is the most efficient means for AEB deployment.  Varela questions the applicability of the published documents on the grounds that FCW+ is not encompassed by the automated vehicles and automated driving systems addressed therein. However, guidance published in 2018, *Automated Vehicles 3.0*, states that: "This document considers automation broadly, addressing *all* levels of automation (SAE automation Levels 1 to 5), and recognizes multimodal interests in the full range of capabilities this technology can offer." *Automated Vehicles 3.0* at viii (emphasis added) (citation omitted). Consequently, we make no distinction between FCW+ and AEB.

¶23         As for Chrysler's assertion that the published guidance establishes a view by the Agency that regulation of automated vehicles and automated driving systems is exclusively federal, we disagree.  Nowhere in any of the four documents does the Agency make such a claim of exclusive regulatory authority.  Instead, the published guidance acknowledges a continuing and collaborative role for states and explicitly encourages states to review tort liability in the automated vehicle and automated driving system contexts.

¶24         Although Chrysler is correct that published guidance "strongly encourage[d] States to allow [the Agency] alone to regulate the safety design and performance aspects of [automated driving system] technology," the Agency acknowledged in *A Vision for Safety* that states "are beginning to draft legislation to safely deploy emerging [automated driving

---

[5] U.S. Dep't of Transp. & Nat'l Highway Traffic Safety Admin., Fed. Automated Vehicles Pol'y, *Accelerating the Next Revolution in Roadway Safety* (Sept. 2016); U.S. Dep't of Transp. & Nat'l Highway Traffic Safety Admin., *Automated Driving Sys. 2.0: A Vision for Safety* ("*A Vision for Safety*"), (Sept. 2017); U.S. Dep't of Transp. & Nat'l Highway Traffic Safety Admin., *Preparing for the Future of Transp.: Automated Vehicles 3.0*, ("*Automated Vehicles 3.0*"), (Oct. 2018); U.S. Dep't of Transp. & Nat'l Highway Traffic Safety Admin., *Ensuring American Leadership in Automated Vehicle Technologies: Automated Vehicles 4.0* ("*Automated Vehicles 4.0*"), (Jan. 2020).

systems]." *A Vision for Safety* at ii.[6] The Agency also noted in *Automated Vehicles 3.0* that states were engaged in regulating the testing and operation of automated vehicles. *Automated Vehicles 3.0* at 19–20. The Agency even suggested that if a state did "pursue [automated driving system] performance-related regulations, that State should consult with [the Agency]." *A Vision for Safety* at 20.

¶25 To support states' efforts, the Agency included in *A Vision for Safety* a "Best Practices" section "to clarify and delineate the Federal and State roles in the regulation of [automated driving systems] and lay out a framework that the States can use as they write their laws and regulations surrounding [automated driving systems] to ensure a consistent, unified national framework." *A Vision for Safety* at 19. Nonetheless, the Agency noted that "[t]he goal of State policies in this realm need not be uniformity or identical laws and regulations across all States. Rather, the aim should be sufficient consistency of laws and policies to promote innovation and the swift, widespread, safe integration of [automated driving systems]." *Id.* at 20. With respect to enforcement, the Agency made clear that "[t]his Guidance is entirely voluntary, with no compliance requirement or enforcement mechanism." *Id.* at 2.

¶26 In delineating the respective roles of the federal government and the states, the Agency also explicitly recognized the states' responsibility to regulate insurance and liability. *Id.* at 20. Specifically, the Agency recommended that states include in applications for permission for roadway testing a request for "evidence of the . . . ability to satisfy a judgment or judgments for damages for personal injury, death, or property damage caused by an [automated driving system]." *Id.* at 23. States were also advised to "[b]egin to consider how to allocate liability among [automated driving system] owners, operators, passengers, manufacturers, and other entities when a crash occurs" and that "[s]tates could begin to consider rules and laws allocating tort liability." *Id.* at 24. The Agency further stated in *Automated Vehicles 3.0* that the traditional roles of each level of government were "well suited" to address the field of automation and that "[s]tates and local governments play the lead role in licensing drivers, establishing rules of the road, and formulating policy in tort liability."

---

[6] *A Vision for Safety* replaced the guidance issued in 2016. *A Vision for Safety* at i. We therefore do not reference the guidance published in 2016.

*Automated Vehicles 3.0* at 5.

**¶27**    The Agency's only direct comment concerning preemption in the field of automated vehicles and automated driving systems concerned issues that would inevitably arise as it developed safety standards. On that point, the Agency simply stated:

> The Department will carefully consider . . . jurisdictional questions as [the Agency] develops its regulatory approach to [automated driving systems] and other automated vehicle technologies so as to strike the appropriate balance between the Federal Government's use of its authorities to regulate the safe design and operational performance of an [automated driving system]-equipped vehicle and the State and local authorities' use of their traditional powers.

*Id.* at 6. There was no further comment with respect to the Agency's intent to preempt states in the field of automated driving systems let alone with respect to AEB specific technology and nothing in the guidance published in 2020 indicated otherwise.[7]

**¶28**    On the whole, the published guidance fails to demonstrate any intent by the Agency to exercise an exclusive regulatory role in the area of automated vehicle and automated driving system testing, development, or deployment. Likewise, the guidance, lacking the force of law and with no requirement for compliance or mechanism of enforcement, does not foreclose the traditional role of states in regulating tort liability. As for any authoritative statement concerning preemption, the closest any document comes to discussing the issue is the acknowledgment that as standards are

---

[7] *Automated Vehicles 4.0*, published in 2020, merely set forth federal principles in support of the development and deployment of automated vehicles, automated driving systems, and it listed available government resources. *Automated Vehicles 4.0* at 1. The publication is devoid of any declaration of exclusive federal regulation of automated systems or vehicles or any statement concerning preemptive intent. With respect to the relationship between the Agency and states in the regulation of automated driving systems, it simply referenced previous "non-binding guidance." *Id.* at 17.

developed, preemption will have to be addressed.

### 3. 2017 Denial of Petition for Rulemaking

**¶29**　　　In 2017, the Agency denied a petition to initiate rulemaking that would have mandated the installation of AEB in all lightweight vehicles like the Jeep Grand Cherokee. 82 Fed. Reg. at 8391. Chrysler insists that the Agency "acted purposefully" in an authoritative and preemptive manner when it denied the petition because its stated policy goals of spurring technological advancement, encouraging consumer acceptance, and promoting safety "were best served not by an inflexible mandate that manufacturers must equip their vehicles with AEB technologies but rather by encouraging innovation and voluntary deployment through methods other than mandatory requirements." Chrysler further concludes that the Agency declined to impose an AEB mandate "at this early stage of technological evolution" because of the "risk of inadvertently stymieing innovation and stalling the development and introduction of successively better versions of these technologies." *Id.* at 8393.

**¶30**　　　However, the preceding quotes come from the section discussing the context in which the petition was considered. None of these points were offered as rationale for declining to grant the petition in the actual analysis and we should consider the *entirety* of the petition's denial to discern whether the Agency conveyed an authoritative policy objective with a preemptive intent. *See Sprietsma*, 537 U.S. at 66 (setting forth Coast Guard's entire explanation for deciding not to engage in regulatory action as part of assessing any preemptive intent).

**¶31**　　　Our review of the Agency's denial establishes that it did not deny the petition due to a belief that mandating installation of AEB technology would hinder development and safety objectives. Instead, the denial was based on the Agency's judgment that other efforts to encourage the deployment of AEB were proving to be as successful as the requested rulemaking would provide and, if needed, rulemaking was always available. 82 Fed. Reg. at 8394. In particular, the Agency noted the success of the Program in "influencing light vehicle manufacturers to increase their installation of AEB technologies and to improve their performance," along with the specific incorporation of AEB technologies in safety ratings. *Id.* The Agency underscored the Program's effectiveness by highlighting voluntary commitments by light vehicle manufacturers to deploy AEB,

including Chrysler, and the role played by independent rating entities to encourage AEB use. *Id.* This led to the conclusion "that the benefits of the AEB aspects of [the Program], in combination with the benefits of the industry commitment and the stakeholder rating programs, would be substantially similar to the benefits of the rulemaking requested by the petitioners." *Id.*

¶32 The Agency also expressed concern over the time it would take to engage in rulemaking, explaining:

> Based on the Agency's rulemaking proceedings on complex issues in recent years, if the Agency were to grant the petition, conduct research, tentatively select required levels of performance, conduct a notice-and-comment rulemaking and provide sufficient lead time to enable manufacturers to phase-in compliance, the delay in making AEB standard equipment on light vehicles would be as many as three years, and possibly longer.

*Id.*

¶33 Furthermore, the Agency simply did not prioritize AEB rulemaking. Acknowledging the success at increasing AEB installation through non-rulemaking activities, the Agency determined that its limited resources could be better spent on tasks of "higher priority," and, "if it proves necessary," rulemaking could be commenced later on. *Id.* The Agency concluded the analysis of the petition by stating that "[g]iven the success of light vehicle AEB activities . . . and the large array of rulemakings either mandated by Congress or initiated by the Agency in response to petitions or at the Agency's discretion, the Agency should place priority at this time on conducting rulemakings in areas other than light-vehicle AEB." *Id.* at 8394.

¶34 We cannot disregard what the Agency has highlighted as its predominant rationale for foregoing rulemaking. *See Williamson*, 562 U.S. at 333–35 (identifying the "more important reason" for permitting manufacturers' an option with seat belt installation as a concern with cost rather than relying on a possible separate regulatory concern for which the record provided only "some indication" of importance). Unlike the preemptive safety standard in *Geier* that intentionally preserved a range of

options for manufacturers because "safety would best be promoted if manufacturers installed *alternative* protection systems in their fleets rather than one particular system in every car," 529 U.S. at 881, the Agency's denial does not reference a goal of preserving manufacturer choice pursuant to any particular safety concern. Simply permitting manufacturer choice in and of itself is not a policy goal entitled to preemptive effect. *Williamson*, 562 U.S. at 338 (Sotomayor, J., concurring) (explaining that the "mere fact" a regulation permits an option to manufacturers does not mean that this option is a preemptive "regulatory objective"). Instead, what animated the Agency's denial boils down to its views on need and speed. Put another way, the Agency denied the rulemaking petition due to the perceived lack of any need for an AEB rule and the lengthy and arduous nature of the rulemaking process.

¶35 The Agency's decision to forego formal rulemaking because, in its judgment, nonregulatory efforts have been or are proving successful does not establish a significant regulatory objective concerning the actual regulation of AEB, nor does it reflect a determination that AEB is best left unregulated. We will not read an agency's preference to avoid formal rulemaking under these circumstances to constitute a statement that "as a matter of policy" there should be no rules governing AEB. *Sprietsma*, 537 U.S. at 67. Similarly, the Agency's decision to forego rulemaking based on its judgment that rulemaking is arduous and that its resources were better invested in other priorities "cannot by itself show that [it] sought to forbid common-law tort suits in which a judge or jury might reach a different conclusion." *Williamson* 562 U.S. at 335. While the Agency's denial of the rulemaking petition certainly reflects an intentional and careful decision to forego formal rulemaking, it does not provide an authoritative policy statement that AEB should not be regulated by state tort law. *See Sprietsma*, 537 U.S. at 67. Overall, the basis for the Agency's denial does not evince a clear authoritative preemptive intent.

### 4. Subsequent Rulemaking Activity[8]

¶36 The Agency published a proposal for rulemaking involving automated driving systems in March of 2020. Occupant Protection for

---

[8] We take notice of the Agency's proposal for rulemaking and advance notice of a proposal for rulemaking pursuant to Arizona Rule of Evidence 201.

Automated Driving Systems, 85 Fed. Reg. 17624 (Mar. 30, 2020). Unlike the 2017 denial, the proposal explicitly addressed preemption. 85 Fed. Reg. 17643 ("Pursuant to Executive Orders 13132 and 12988,[9] [the Agency] has considered whether this proposal could or should preempt State common law causes of action."). The Agency stated therein:

> To this end, the agency has examined the nature (*e.g.*, the language and structure of the regulatory text) and objectives of this proposal and finds that this proposal, like many [Agency] rules, would prescribe only a minimum safety standard. As such, [the Agency] does not intend that this proposal preempt state tort law that would effectively impose a higher standard on motor vehicle manufacturers than that to be established by this proposal. Establishment of a higher standard by means of State tort law would not conflict with the minimum standard announced here. Without any conflict, there could not be any implied preemption of a State common law tort cause of action.

*Id.* Thus, the most recent Agency statement in the field of automated driving system regulation reflects no intent to preempt state tort law. Because automated driving systems employ AEB technology, this statement further bolsters our conclusion that the Agency has not impliedly preempted tort claims like those Varela alleges here.

¶**37** More recently in December 2020, the Agency published an advance notice of proposed rulemaking that envisioned "a framework

---

[9] Executive Order 12988, signed by President William J. Clinton, requires agencies to review a proposed regulation to ensure it "specifies in clear language the preemptive effect, if any, to be given to the regulation . . . ." Civil Justice Reform, 61 Fed. Reg. 4729, 4731 (Feb. 7, 1996). Executive Order 13132, also signed by President William J. Clinton, requires that "[w]hen an agency proposes to act through adjudication or rulemaking to preempt State law, the agency shall provide all affected State and local officials notice and an opportunity for appropriate participation in the proceedings." Federalism, 64 FR 43255, 43257 (Aug. 10, 1999).

approach to safety . . . [that] would use performance-oriented approaches and metrics that would accommodate the design flexibility needed to ensure that manufacturers can pursue safety innovations and novel designs in [automated driving system] technologies." Framework for Automated Driving System Safety, 85 Fed. Reg. 78058, 78059 (proposed Dec. 3, 2020) (to be codified at 49 C.F.R. pt. 571). The Agency specifically referenced the guidance published in 2017, 2018, and 2020, noting that the approaches to developing a new framework "would likely build off the three primary [automated driving system] guidance documents issued in recent years by DOT." *Id.*

¶38 Consistent with the referenced documents, the advance notice makes no statement of "exclusive" regulatory authority nor, unlike the March notice, does it reference preemption. It also notes activity within some states, including Arizona, to permit the operation of automated driving system vehicles on state roadways. *Id.* at 78060. These two notices make clear that where preemption related to automated vehicles and automated driving systems regulation is of concern, the Agency will explicitly address it; otherwise, the status quo is maintained with respect to the role of state law in motor vehicle safety regulation.

## C. Actual Conflict

¶39 Chrysler argues that allowing Varela's claims to proceed "would frustrate [the Agency's] federal regulatory objectives by thrusting a jury-imposed AEB standard on [manufacturers] inside Arizona's borders." *Dashi*, 247 Ariz. at 64 ¶ 42. We disagree. To the extent there is a manifest Agency policy objective concerning AEB installation, it is to see AEB deployed as quickly and as broadly as possible. Varela's suit may spur the very type of activity the Agency seeks. A jury finding in Varela's favor could encourage manufacturers who have decided to offer AEB technology on vehicles for sale to make AEB standard on all trim levels and not just some. Varela's suit may provide a complementary shove to the "pull" resulting from efforts by the Agency to encourage voluntary compliance for increased AEB deployment and the "push" from the effects of the Program and independent rating agencies to highlight the use of AEB by manufacturers. 82 Fed. Reg. at 8391.

¶40 Varela's claims would thus not conflict with the "execution of the full purposes and objectives" of the Agency if the message conveying a

preemptive intent is one setting a goal for the speedy and widespread deployment of AEB. *See Williamson*, 562 U.S. at 330 (quoting *Hines*, 312 U.S. at 67). Regardless, "we are reluctant in the absence of strong evidence," to find an actual conflict between state law and federal policy goals where the Agency has not communicated that any conflict may exist. *Hillsborough Cnty. Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 721 (1985).

¶41 Finally, because the applicability of implied obstacle preemption is a threshold issue, we have no occasion to consider the merits of Varela's claims.

## D. Applicable Precedent

¶42 While our assessment of the administrative record and conclusion regarding any actual conflict with Varela's claims are dispositive of the issue before us, we nevertheless consider the parties' arguments concerning an apparent conflict regarding conclusions about preemption between *Dashi* and the court of appeals' opinion in this case.

¶43 The court of appeals observed that there are essentially two sets of cases that bear on the matter before us: *Geier* and *Dashi*, and *Sprietsma* and *Williamson*. *Varela*, 249 Ariz. at 95 ¶ 17. Chrysler argues that *Geier* and *Dashi* apply to this matter because each addresses a similar Agency policy objective concerning manufacturer choice, and each involves tort claims like Varela's. Chrysler further asserts that because *Dashi* properly relied on *Geier* for its analysis, *Dashi* should likewise guide our analysis of Agency objectives and review of the administrative record. Varela argues that the court of appeals properly recognized that *Dashi* did not apply, and that *Sprietsma* is the controlling U.S. Supreme Court precedent. We consider each case in turn.

### 1. *Geier v. American Honda Motor Co.*

¶44 *Geier* considered whether the plaintiff's state law tort suit conflicted with the Federal Motor Vehicle Safety Act (the "Act") and Federal Motor Vehicle Safety Standard ("FMVSS") 208 promulgated pursuant to the Act. 529 U.S at 864–65. The plaintiff's suit alleged negligence and design defect on the part of a car manufacturer for failing to install a driver's side airbag in a car, which otherwise complied with applicable safety standards. *Id.* at 865.

¶45        After initially finding the suit not expressly preempted by the Act, but nonetheless subject to implied preemption principles, the Court examined the language of the regulation, a contemporaneous explanation for providing a range of choices of passive restraint systems, and DOT's amicus brief that explained that "safety would best be promoted if manufacturers installed *alternative* protection systems in their fleets rather than one particular system in every car."  *Id.* at 881.  Lastly, the Court "place[d] some weight upon DOT's interpretation of FMVSS 208's objectives and its conclusion, as set forth in the Government's [amicus] brief, that a tort suit such as this one would 'stan[d] as an obstacle to the accomplishment and execution' of those objectives."  *Id.* at 883 (citation omitted) (internal quotation marks omitted).

¶46        The Court ultimately concluded that if the plaintiff prevailed in the lawsuit, "manufacturers of all similar cars [would have been required] to install airbags rather than other passive restraint systems, such as automatic belts or passive interiors."  *Id.* at 881.  Consequently, implied obstacle preemption applied "[b]ecause the rule of law for which petitioners contend would have stood as an obstacle to the accomplishment and execution of the important means-related federal objectives" as discussed.  *Id.* (citation omitted) (internal quotation marks omitted).

¶47        Chrysler characterizes *Geier*'s holding as providing "that when [the Agency] declines to require a particular safety feature because preserving manufacturers' choice furthers important federal policy goals, plaintiffs cannot attempt to impose that requirement through state tort liability."  Chrysler's generalization of the holding of *Geier* and the argument that it is outcome determinative in this case calls forth an observation we share with the Texas Supreme Court: "when *Geier*'s reasoning is oversimplified to find preemption based on a choice between two safety options and then exported to other safety standards where the unique text and history of [the passive restraint regulation in question] are not relevant, we must respectfully disagree."  *Hinton*, 329 S.W.3d at 497.

¶48        We also note the importance of an actual promulgated safety regulation to *Geier*'s conclusion as underscored in *Williamson*.  562 U.S. at 336 (reviewing whether the Act and an amended version of FMVSS 208 preempted a lawsuit over a manufacture's failure to install a particular style of seatbelt).  Therein, the Court explicitly stated that it determined the significant policy in question in *Geier* "on the basis of our examination of

the regulation, including its history, the promulgating agency's contemporaneous explanation of its objectives, and the agency's current views of the regulation's [preemptive] effect." *Id.* at 330.

¶49        In the case before us, there is no promulgated safety standard for us to examine. While not fatal to Chrysler's conflict preemption claim, *see supra* ¶ 9, this does render *Geier*'s analysis inapplicable. Unlike the passive restraint systems regulated in *Geier*, the Agency has neither authorized nor required any particular AEB system or specific combination of AEB component features from which Chrysler or any other manufacturer may reference to assert regulatory compliance. Likewise, we lack any DOT statement on preemption as to whether a suit like Varela's would create an obstacle to AEB policy objectives remotely like the explicit position the DOT provided in *Geier*. Therefore, given the distinctly different facts and the lack of a promulgated regulation with express agency views, we conclude that *Geier* does not control our determination of preemption nor does it offer an analogous framework for analysis.

### 2. *Dashi v. Nissan North America, Inc.*

¶50        *Dashi* involved a suit where the plaintiff claimed the 2008 Nissan Rogue that hit her vehicle was "unreasonably dangerous and defective" because it lacked then-available AEB technology. *Dashi*, 247 Ariz. at 58 ¶ 3. *Dashi* analyzed the administrative record before the court under the framework set forth in *Geier*, *id.* at 60–64 ¶¶ 14–39, and concluded that the plaintiff's claims were preempted by the doctrine of implied obstacle preemption, *id.* at 67 ¶ 59. Chrysler contends we should agree with *Dashi*'s preemption finding and overrule the court of appeals in this case because *Dashi* "correctly focused on DOT and [the Agency's] statements regarding their 'broad enforcement authority to address existing and new automotive technologies and equipment,' and [*Dashi*'s] emphasis on preemption in this context, including citation to *Geier*." (Quoting *id.* at 64 ¶ 39).

¶51        There are two reasons we decline to follow *Dashi*'s finding on preemption. The first has to do with the reliance on *Geier*. As with the record before us, the *Dashi* court did not have a regulation to review, which featured so heavily in *Geier*'s analysis. Therefore, as discussed above, *Geier* does not provide the appropriate analytical framework for determining AEB preemption. Second, the record for our review has two notices of

proposed rulemaking issued by the Agency concerning automated driving systems since *Dashi* was decided. Significantly, while the *Dashi* court noted that it did not "have the benefit of an express agency position on [implied preemption]," *id.* at 61 ¶ 26, the Agency's March 2020 notice explicitly addresses preemption and disavows a preemptive intent. Therefore, given *Dashi*'s errant reliance on *Geier*'s analytical framework and the expanded record that now includes an express Agency view on preemption since it was decided, we overrule *Dashi*.

### 3. *Sprietsma v. Mercury Marine*

**¶52** In *Sprietsma*, a passenger fell overboard from a boat and struck the propeller blade resulting in fatal injuries. 537 U.S. at 54. Notably and like the Agency's action in our case, the Coast Guard had declined to promulgate a regulation concerning the equipment in question, specifically one that would have required propeller guards on outboard motors. *Id.* at 61–62. After concluding that the authorizing congressional enactment in question did not preempt the plaintiff's claims, the Court then considered whether the decision by the Coast Guard to forego regulating propeller guards was entitled to preemptive effect. *Id.* at 62–64.

**¶53** Although the state supreme court below had concluded "that the Coast Guard's failure to promulgate a propeller guard requirement here equates to a ruling that no such regulation is appropriate pursuant to the policy of the [Federal Boat Safety Act]," the Court noted its conclusion did not account for the Coast Guard's entire explanation for declining to regulate propeller guards:

> The regulatory process is very structured and stringent regarding justification. Available propeller guard accident data do not support imposition of a regulation requiring propeller guards on motorboats. Regulatory action is also limited by the many questions about whether a universally acceptable propeller guard is available or technically feasible in all modes of boat operation. Additionally, the question of retrofitting millions of boats would certainly be a major economic consideration.

*Id.* at 66 (citation omitted). According to the Court, "[t]his statement

reveal[ed] only a judgment that the available data did not meet the [Federal Boat Safety Act's] 'stringent' criteria for federal regulation." *Id.* at 66–67. Importantly, "[t]he Coast Guard did not take the further step of deciding that, as a matter of policy, the States and their political subdivisions should not impose some version of propeller guard regulation, and it most definitely did not reject propeller guards as unsafe." *Id.* at 67.

¶54    The Court thus concluded that "although the Coast Guard's decision not to require propeller guards was undoubtedly intentional and carefully considered, it [did] not convey an 'authoritative' message of a federal policy against propeller guards." *Id.* As for any conflict with a state tort suit, the Court observed that "nothing in [the Coast Guard's] official explanation would be inconsistent with a tort verdict premised on a jury's finding that some type of propeller guard should have been installed on this particular kind of boat equipped with respondent's particular type of motor." *Id.*

¶55    The fact that the matter before us similarly lacks a promulgated safety standard addressing the equipment in question and involves a similar agency action—the denial of a petition for rulemaking—renders *Sprietsma* more relevant to our case than *Geier*. *Sprietsma* is also instructive with respect to weighing an agency's judgment in our determination of whether the Agency has conveyed an authoritative message concerning the regulation of AEB for our preemption analysis.

### 4. *Williamson v. Mazda Motor of America, Inc.*

¶56    The court of appeals also identified *Williamson* as a case bearing on the analysis of Varela's claims. We agree. *Williamson* dealt with the same authorizing Act and FMVSS as *Geier* did, albeit an older version of the FMVSS. *Williamson*, 562 U.S. at 326–27. The plaintiff's design defect claim was based on the manufacturer's alleged failure to install the proper seatbelt in a rear inner passenger seat. *Id.* at 327. The FMVSS gave manufacturers a choice to use either a lap belt or a lap-and-shoulder-belt on rear inner seats, such as the middle seat of a minivan. *Id.* at 326.

¶57    The issue was whether the regulation affording manufacturers a seat belt option preempted a tort suit that would have required a specific seat belt. *Id.* Although the safety standard provided manufacturers with options, the choice provision alone was not dispositive.

*Id.* at 332. Reviewing the record before it, the Court distinguished the decision to permit manufacturer choice in seatbelts from the passive restraint system options permitted in *Geier*. *Id.* at 333. Instead of being based on safety, "[t]he more important reason why DOT did not require lap-and-shoulder belts for rear inner seats was that it thought that this requirement would not be cost effective." *Id.* at 335. While acknowledging an agency could preempt state tort suits based on a cost-effectiveness judgment, the Court observed that such a judgment "cannot by itself show that DOT sought to forbid common-law tort suits in which a judge or jury might reach a different conclusion." *Id.* Lastly, the Court considered the Agency's own view that the regulation in question did not preempt the suit before the Court and harkened back to the explanation from the Solicitor General in *Geier* "that a standard giving manufacturers 'multiple options for the design of' a device would not pre-empt a suit claiming that a manufacturer should have chosen one particular option, where 'the Secretary did not determine that the availability of options was necessary to promote safety.'" *Id.* at 335–36 (citation omitted).

¶58 *Williamson* is thus useful in our case for considering what weight, if any, to give to the Agency's judgment in determining the preemptive effect of the denial to engage in AEB rulemaking in 2017. The caution against inferring an intent to preempt state law solely based on an agency's judgment to permit choice among available safety devices is equally informative.

### III. Conclusion

¶59 We conclude that the Agency has neither conveyed an authoritative statement establishing manufacturer choice as a significant federal policy objective nor made explicit a view that AEB should not be regulated. The record also does not reflect an intent to restrict regulation of automated vehicles and automated driving systems beyond traditional federal regulatory authority nor is there a definitive statement that states may not regulate. To the contrary, the Agency has acknowledged that states have regulated and are continuing to regulate in the field of development and deployment of automated driving systems and has encouraged states to undertake a review of how liability may be affected in an automated driving system environment. What is likewise evident throughout the entirety of the regulatory record is the Agency's emphatic commitment to partnering with states to facilitate the ongoing development

and safe deployment of automated vehicle and automated driving system technology, of which AEB is a component.

¶60 To the extent the administrative record reflects a federal policy about AEB technology, it is that the Agency encourages AEB innovation and desires it be deployed more broadly and sooner rather than later. Because Varela's claims are focused on the availability of FCW+ across all trim levels of the Jeep Grand Cherokee, they are not in conflict with any identified Agency objectives or policies. Accordingly, we find her claims are not preempted by the doctrine of implied obstacle preemption.

¶61 *Geier* is inapposite to the facts and record before us and therefore does not control our decision, and we overrule *Dashi*. Given the nature of the administrative record before us and the exercise of the Agency's judgment to forego formal rulemaking, S*prietsma* and *Williamson* provide the appropriate guidance for our determination.

¶62 We affirm the court of appeals but vacate ¶¶ 11–22 of the opinion, reverse the trial court's order, and remand the case to the trial court for further proceedings.